629 A.2d 633

**Ronald NANCE and Kevin Hardy**

v.

**STATE of Maryland.**

**No. 142, Sept. Term, 1992.**

Court of Appeals of Maryland.

Aug. 23, 1993.

550

Melissa M. Moore, Asst. Public Defender (Stephen E. Harris, Public Defender, of Baltimore, on brief), for petitioner.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, on brief), for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

This case presents the classic evidentiary problem of the turncoat witness. We must determine the admissibility, as substantive evidence, of witnesses' out-of-court identifications, signed statements to police, and grand jury testimony, all of which the witnesses largely repudiated at trial.

## I

Shortly after nine o'clock on the evening of April 3, 1990, gunshots erupted near the intersection of East Lombard and

South Exeter Streets adjacent to the Flag House projects in Baltimore City. A passer-by, Sandra Keve, was struck in the leg and crawled to safety. The target of the shooting, Aaron Carroll, was struck repeatedly by bullets. He staggered down Exeter Street, collapsing onto a spectator, Antonio Harris. Harris called out for help to a friend, Rodney McCormick, and the two men carried Carroll to a grassy patch nearby, where he died. The Medical Examiner reported that Carroll had been hit by at least four shots. The State crime laboratory reported that the bullets retrieved from Carroll's body had been fired from at least two revolvers, either of .22 caliber or .38 caliber.

## The Extrajudicial Events

There then ensued a sequence of investigatory steps by police and the Grand Jury for Baltimore City which, for clarity's sake, we set out episodically in some detail. Detectives Marvin Sydnor and Bertina Silver testified to the events at which police were present. The record also includes the pertinent grand jury proceedings.

Beginning at 11:35 p.m. on April 3, Rodney McCormick gave a statement to police detectives in which he said he heard shots on the street, and then joined Harris in aiding Carroll. McCormick added that he believed the shooting to be related to a turf dispute between drug dealers. He stated that earlier on April 3 he had overheard a conversation at a neighborhood store, Bell's Carry Out, in which Petitioner Nance told Petitioner Hardy and a third man, "After we fuck him up, if he come back down here, we gonna kill him." McCormick further reported that later on April 3 he observed Nance, Hardy, and the third man beating Carroll, during which fight Nance took away Carroll's pistol. Both the questions and answers of this interview were written out on paper. The entire statement was read aloud to McCormick, who acknowledged it as true, noted the date and time, 1:05 a.m. of April 4, and signed it.

Immediately thereafter, at 1:13 a.m. of April 4, McCormick was shown an array of six photographs. Detective Silver testified that McCormick was first read a standard instruction, which explained in pertinent part:

This group of photographs may or may not contain a picture of the person who committed the crime now being investigated.... When you have looked at all the photos tell me whether or not you see the person who committed the crime.

McCormick selected the picture of Petitioner Nance as the man involved in the earlier fight with Aaron Carroll; Detective Silver recorded his remark, "That's him right there." To signal his choice, McCormick signed the photograph and also noted the time and date.

Beginning at 2:30 a.m. on April 4, Antonio Harris gave a statement to police detectives in which he said that he saw Nance, Hardy, and a man named Matthew come up the street, pull guns, and shoot Carroll, who was unarmed. He reported, "Matthew fired first, then everybody else started shooting." He heard "a good eight" shots. Carroll then ran to Harris and fell on him; then, with McCormick's help, Harris carried the victim away. Harris described Nance's weapon as a small revolver. He described Hardy's physical appearance and clothing. Harris identified Nance as his own brother, presumably his half-brother. He added that he had known Hardy for more than 10 years. Harris further told police that Carroll was shot for trying to deal drugs in a building where Carroll's killers sold them, and which they considered their own territory. As before, the questions and answers of this interview were reduced to writing. The entire statement was read aloud to Harris; he acknowledged it as accurate and true, initialed each of its 12 pages, and signed its last page at 3:30 a.m.

Immediately thereafter, at 3:45 a.m. of April 4, Harris was read the standard instructions for a photographic array procedure as quoted above. He viewed several groups of six photographs each, from which he selected the picture of his

half-brother, Nance. He signaled his choice by signing the photograph and noting the time and date. At 1:36 p.m. that afternoon, Harris again viewed an array of photographs, from which he selected and signed the picture of Hardy. Detective Silver recorded Harris' comment, "That's Hardy."

The Grand Jury for Baltimore City convened on April 4. Testifying under oath and penalty of perjury, McCormick and Harris repeated the substance of their statements given earlier to police.[1] In addition, McCormick and Harris acknowledged having selected photographs of Petitioners as the men they saw either beating Carroll or shooting Carroll. Their grand jury testimony was recorded and transcribed verbatim.

Beginning at noon on November 26, 1990, Harris gave another statement to police and to an Assistant State's Attorney.[2] Harris told them that he had been approached by one Ernest Barnes, a friend of the third suspect, Matthew. Harris reported that he accompanied Barnes to the office of Matthew's lawyer, to whom he said that he would not testify at trial against any of the gunmen. He explained that he feared Barnes would retaliate if he testified, and wished to deceive him. Harris said he was afraid, "Cause every time he [Barnes] has a problem, about two days or a day after somebody's always getting beat up or hurt." Nevertheless, Harris confirmed his original statement to police and indicated his willingness to testify in court. Detective Silver wrote out the questions and answers of this interview on paper. The entire statement was read aloud to Harris, who acknowledged it as true, noted the time and date, and signed it.

---

1. Harris in his grand jury testimony was less certain as to Hardy's conduct. He said he saw Hardy with a gun, but could hardly see whether Hardy fired. Neither witness was asked before the grand jury about the alleged drug turf war that ostensibly provoked the shooting.

2. Both McCormick and Harris had met with a State's Attorney on September 21, 1990, to verify the contents of their April statements. The record does not contain any written account of the September meeting.

Beginning at 10:43 a.m. on January 22, 1991, a third witness, Thomas Brown, gave a statement to police and an Assistant State's Attorney. He told them that he saw Nance, Hardy, Matthew, and others beating Aaron Carroll during the daytime of April 3, 1990, because Carroll sold drugs in their territory. Carroll then ran off, saying "It's gonna be war," as Nance pointed a gun at him. Brown added that later Matthew warned him, "You don't know nothing." Brown said he was afraid of the men he saw. The questions and answers of the interview were reduced to writing. Brown read the entire statement, initialed each of its pages, acknowledged it as true, noted the date and time, and signed it.

The next day, January 23, 1991, Brown gave a second statement to police concerning a letter he had received from Petitioner Hardy. Brown stated that Hardy wrote, in part, "You were my only hope in dealing with those things left unfinished." He explained that Hardy meant Brown was the only person left on the street available to kill Antonio Harris for cooperating with the police investigation of Aaron Carroll's murder. The questions and answers were again reduced to writing. Brown read the entire statement, initialed each page, acknowledged it as correct, and signed it.

## The In–Court Testimony

At trial, the witnesses recanted, either by disavowing their prior identifications and statements or by claiming no memory of them. Called as a court's witness, Antonio Harris testified that he ran and hid during the shooting, and saw the incident only after the wounded victim approached him on Exeter Street; he repeatedly asserted that he did not see the killing. He stated that after Carroll died, he and McCormick left the scene and then used heroin to the point of intoxication.

On cross-examination Harris remembered giving the April 4 statement to police. He acknowledged having initialed or signed its pages. He remembered answering the detectives' questions pertaining to his name, address, age, and his prior acquaintance with Nance and Hardy. As for the questions

and responses implicating Petitioners in Carroll's death, Harris sometimes repudiated his former answers or sometimes stated he did not remember giving them. He acknowledged having viewed photo arrays and having put his signature on the pictures of Nance and Hardy, but contended that he merely indicated to police that they were persons he knew and recognized. Harris further testified that he did not remember his grand jury testimony. He acknowledged his signature on the November 26 statement, but asserted that he had no memory of the questions and answers concerning his encounter with Ernest Barnes, and no current memory of accompanying Barnes to the office of Matthew's lawyer. He stated that he was not afraid of reprisals, nor had he been threatened.

Harris could not explain how the police obtained the information contained in his April 4 and November 26 statements to detectives. He could not explain how the grand jury obtained the information contained in his transcribed testimony. He contended that he was steadily intoxicated by drugs throughout the months in question.

Rodney McCormick testified that he assisted the wounded Carroll. He denied that he had seen a fight involving Nance, Hardy, Matthew, and Carroll earlier on April 3. He said both that he did remember, and that he did not remember, giving a statement to police. He remembered giving detectives his name, address, and date of birth; he acknowledged his signature on the statement. He stated that he did not remember the questions or his former answers concerning a drug turf war at the projects, the conversation in Bell's Carry Out, or the melee in which Carroll was beaten.

McCormick said he remembered looking at a photo array and acknowledged his signature on the picture of Nance. He first stated that he did not remember selecting Nance's photograph, and later that he was simply pointing out someone he knew. McCormick testified that he had no memory of his appearance before the grand jury. He added that he was not deliberately pretending to forget the prior events out of fear.

Thomas Brown remembered making statements on January 22 and January 23, 1991; he acknowledged having signed both. He denied having identified by name any of the participants in the April 3 fight. He testified that the police forced him to make the January 22 statement to escape criminal charges himself. Brown averred that the answers recorded in the January 23 statement were false. He explained that Hardy's letter to him about "dealing with those things left unfinished" meant only that Brown was to find witnesses and bring them to court.

Detectives Sydnor and Silver testified that all of the statements in question were freely given and signed. They stated that the interviews and photo arrays were accurately documented. The detectives believed that Harris and McCormick were sober during all of their sessions with police. Detective Silver said that Antonio Harris informed her on March 13, 1991—shortly before the trial—that he would change his testimony: "He told me that he wasn't going to testify, that he was scared and we were protecting him now, but who was going to protect him after he gave his statement?" Apart from the out-of-court statements and identifications by Harris, McCormick, and Brown, no evidence linked Petitioners to the murder of Aaron Carroll.

## II

The Circuit Court for Baltimore City (Mitchell, J.) admitted all of the disputed evidence. The court ruled that the witnesses' out-of-court identifications of Petitioners by means of the photo array procedures could be used as substantive evidence of guilt. It left unresolved the substantive import of the witnesses' written statements bearing on identification; counsel were allowed to argue this point to the jury.[3] The court

---

**3.** Questions of admissibility of evidence, including whether evidence is admissible generally and substantively or only for a limited purpose such as impeachment, are for the court and not the jury. *Stevenson v. State,* 289 Md. 167, 179, 423 A.2d 558 (1980). Because we hold that the prior inconsistent statements to which the instruction referred were

instructed the jury that, ordinarily, prior inconsistent statements may be used only to impeach witness credibility.

The jury convicted Petitioners of first-degree murder, conspiracy to murder, second-degree attempted murder of Sandra Keve, and related handgun offenses. The trial court sentenced each to imprisonment for life for the murder of Carroll, a consecutive term of life imprisonment for conspiracy to murder, a consecutive 30–year term for the attempted murder of Ms. Keve, and a consecutive 15–year term for the weapons charges. The Court of Special Appeals affirmed. *Nance v. State,* 93 Md.App. 475, 613 A.2d 428 (1992). We granted certiorari to address the substantive use of the recanted extrajudicial identifications; the sufficiency of such evidence, if admissible, to support the convictions; and the admissibility, as substantive proof, of the witnesses' prior inconsistent grand jury testimony.

## III

The witnesses' identifications of Petitioners, statements to police, and grand jury testimony were hearsay. That is, they were statements,[4] other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. *Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988). As it derives its value not solely from the credit given to the witness reporting it, but to the perception, veracity, and competency of the declarant, hearsay evidence is generally not admissible as affirmative proof of guilt. *See Johnson v. State,* 237 Md. 283, 290–291, 206 A.2d 138 (1965); *Judy v. State,* 218 Md. 168, 174–175, 146 A.2d 29 (1958). Hearsay is admissible if offered for impeachment, *i.e.,*

---

admissible as substantive evidence, the trial judge's error, which might have permitted the jury to consider the statements solely for purposes of impeachment, operated in favor of the defendant and was harmless.

4. A "statement" within the meaning of the hearsay rule may consist of an oral or written assertion, or nonverbal conduct intended as an assertion, such as the selection of a photograph to identify the perpetrator of a crime.

to show that witnesses on prior occasions had uttered statements inconsistent with their present testimony. *Ali, supra,* 314 Md. at 305, 550 A.2d 925; *Sun Cab Company, Inc. v. Cusick,* 209 Md. 354, 361–362, 121 A.2d 188 (1956). If, however, there are separate circumstances providing the requisite indicia of trustworthiness concerning the truthfulness of the out-of-court statements, such statements may be admitted substantively as an exception to the rule against hearsay. *Ali, supra,* 314 Md. at 304–305, 550 A.2d 925.

The question lying at the heart of this case is whether the extrajudicial identifications and grand jury testimony of the witnesses were admissible as substantive evidence, notwithstanding the witnesses' repudiation of those statements. Petitioners argue that the witnesses' recantation necessarily dissipated the reliability of such evidence to the point that it must be excluded from the prosecution's case in chief. They further contend that because the defense did not have the opportunity to cross-examine the declarants at the time the prior statements were made, it was unfair to admit them substantively. They add that the defense was denied effective cross-examination at the trial, where the witnesses persistently claimed loss of memory. Petitioners fear that the admission of grand jury testimony would defeat the State's interest in protecting the secrecy of grand jury proceedings. Finally, Nance and Hardy argue generally that a rule permitting the use of prior inconsistent statements as substantive evidence would encourage police to pressure witnesses into making out-of-court statements without regard to their accuracy, because police would know that if the witnesses later recanted, the prior statements would be admissible at trial.

### The Extrajudicial Identifications

It is well settled in Maryland that a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness when made under circumstances precluding the suspicion of unfairness or unreliability, where the out-of-court declarant is present at trial and subject to cross-examination. *Bedford v.*

*State*, 293 Md. 172, 176–179, 443 A.2d 78 (1982); *Johnson, supra,* 237 Md. at 289–291, 206 A.2d 138; *see Judy, supra,* 218 Md. at 172–176, 146 A.2d 29; *Basoff v. State*, 208 Md. 643, 650–651, 119 A.2d 917 (1956). An extrajudicial identification is sufficient evidence of criminal agency to sustain a conviction, even though the declarant is unable to identify the accused at trial. *Bedford*, 293 Md. at 185, 443 A.2d 78.

The rationales for this exception to the rule against hearsay have been fully articulated. The extrajudicial identification is admitted for its greater probative value because it occurred closer to the time of the offense, and is therefore more likely to be accurate. *Id.*, 293 Md. at 178–179, 443 A.2d 78, citing *Commonwealth v. Torres*, 367 Mass. 737, 739, 327 N.E.2d 871 (1975). It is admitted because the original identification was made under less suggestive circumstances than those existing at trial, and is accordingly more reliable. *Bedford*, 293 Md. at 178–179, 443 A.2d 78, relying on *Torres, supra,* and *People v. Gould*, 54 Cal.2d 621, 626–627, 7 Cal.Rptr. 273, 354 P.2d 865 (1960). Because the declarant is available as a witness at trial for cross-examination about the prior identification, some of the danger that the hearsay rule seeks to avoid is not present. *Bedford, supra,* 293 Md. at 178, 443 A.2d 78; *Johnson, supra,* 237 Md. at 290, 206 A.2d 138. We observe, also, that the steps of an identification procedure, such as a photographic array or police line-up, can be objectively recounted by the witness and are readily documented, further enhancing the identification's trustworthiness.

▮ Petitioners insist that this case, in which the witnesses recanted their prior identifications, differs significantly from *Bedford* and others where the witnesses merely were unable to identify the accused at trial. They rely on *Gibbs v. State*, 7 Md.App. 35, 253 A.2d 446 (1969), in which the victim of a robbery testified at trial not only that he was mistaken in his out-of-court identification, but that the defendant was not in fact the robber. The positive exculpation of the defendant in *Gibbs* is a far cry from the instant case, where the witnesses at trial said only that they did not observe Nance and Hardy

engage in criminal acts. Furthermore, the witness in *Gibbs* did not, as here, repeatedly and consistently confirm his original identification in signed statements to police and in grand jury testimony.

Ample authority supports the admission of an extrajudicial identification even where the witness recants at trial. Interpreting the corresponding Federal Rule of Evidence applicable to identifications, 801(d)(1)(C), the United States Court of Appeals for the Second Circuit upheld the probative use of a prior identification later disclaimed by the witness on the grounds that it was made when the witness's memory was fresher and there had been less opportunity for influence to be exerted upon him. *United States v. Marchand,* 564 F.2d 983, 996 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). *Accord United States v. O'Malley,* 796 F.2d 891, 898–899 (7th Cir.1986) (witness recanting identification of defendant as extortionist). *See United States v. Elemy,* 656 F.2d 507, 508 (9th Cir.1981) (rule enacted to remedy problem where before trial witness identifies the defendant and then, because of fear, refuses to acknowledge his previous identification). *See also* 4 Weinstein & Berger, *Weinstein's Evidence* at page 801–222 (1992) (Congress intended that absence of memory, or even a denial, by the identifying declarant at trial would not bar testimony of a witness to the identification). State appellate courts have taken the same view. *See, e.g., People v. Malone,* 193 Mich.App. 366, 483 N.W.2d 470, 471–472 (1992) (extrajudicial identification admitted substantively even though witness refused to acknowledge it at trial); *State v. Grover,* 55 Wash.App. 252, 777 P.2d 22, 23–25 (1989) (out-of-court statement of identification excluded from operation of hearsay rule notwithstanding that witness denied any memory of crime or of her identification of defendant).

More generally, the Supreme Court of Virginia has justified the probative use of prior identifications in these terms: "[T]he memory of a witness may fade.... It is also not beyond the realm of possibility that an identifying witness may be inhibited by threat or intimidation from making a

positive in-court identification." *Niblett v. Commonwealth*, 217 Va. 76, 225 S.E.2d 391, 394 (1976). This Court in *Bedford*, *supra*, 293 Md. at 178, 443 A.2d 78, also implicitly recognized the possibility of witness intimidation: "The failure of the witness to repeat the extrajudicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances." Among such other circumstances are threats and fear of retaliation.

One final case is applicable. In *People v. Lucky*, 45 Cal.3d 259, 247 Cal.Rptr. 1, 18, 753 P.2d 1052, 1070 (1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 848, 102 L.Ed.2d 980 (1989), the Supreme Court of California stated a refinement to its holding in *People v. Gould*, *supra*, 7 Cal.Rptr. at 273, 354 P.2d at 865. The California court held that a repudiated identification may form the basis for conviction if it was reiterated by the witness under oath at a preliminary examination or other judicial proceeding, and there was evidence from which the factfinder could credit the witness's prior testimony over his or her failure to confirm the extrajudicial statements at trial.

In the instant case, the petitioners do not contend that the identification procedures were suggestive or otherwise unfair. Rather, they argue that the value of the evidence of the prior procedures lies in the statements that accompanied and were a part of the identifications, and they contend these statements should not have been admitted as substantive evidence.

Harris and McCormick twice repeated their identifications, once in signed statements and once under oath in a proceeding before the grand jury. For reasons discussed hereafter, we find those statements to be independently admissible as substantive evidence. Moreover, there was evidence from which the jury could infer that the witnesses had made truthful identifications out of court, only to become disingenuous at trial. There was evidence that an atmosphere of fear and threats of reprisals existed in the interim between the crime and the trial. Witness Antonio Harris was bound by fraternal ties to his half-brother, Nance. The witnesses at trial experienced only a selective failure of memory; they remembered

the innocuous features of their prior statements, but forgot the incriminating assertions bearing on identification. Finally, the jurors no doubt perceived that *all* of the key witnesses similarly recanted, a most unlikely coincidence that was meaningful in itself. Viewing these facts in the light of the cases from Maryland and other jurisdictions cited above, we conclude that the trial court properly admitted, as substantive evidence of guilt, the out-of-court identifications of Petitioners as those responsible for Aaron Carroll's murder.

## The Prior Inconsistent Statements

Distinct from the photographic array evidence, the witnesses gave signed statements consisting of the questions and answers at their police interviews. The statements identified Nance and Hardy as the perpetrators of criminal acts as part of the witnesses' larger descriptions of what happened on April 3, 1990, *i.e.*, the conversation at Bell's Carry Out, the beating of Carroll, and the shooting of Carroll. These statements were repudiated at trial.[5]

A witness's out-of-court statements inconsistent with in-court testimony ordinarily are not treated as substantive evidence but, as hearsay, may be used only to impeach the witness. *Smith v. Branscome*, 251 Md. 582, 590, 248 A.2d 455 (1968). This Court has expressed reluctance to parse out statements of identification from larger extrajudicial statements containing additional information that does not otherwise fall under an exception to the rule against hearsay. *See Mouzone v. State*, 294 Md. 692, 702, 452 A.2d 661 (1982). Nevertheless, the witnesses' photographic identifications were so closely related to their statements bearing on identification, and these, in turn, were so tightly intertwined with their

---

5. Inconsistency includes both positive contradictions and claimed lapses of memory. *State v. Devlin*, 251 Mont. 278, 825 P.2d 185, 187 (1991). When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. *People v. Johnson*, 3 Cal. 4th 1183, 14 Cal.Rptr.2d 702, 719, 842 P.2d 1, 18 (1992).

statements as a whole, that it is useful to analyze the substantive admissibility of prior inconsistent statements generally.

Maryland is one of only a handful of states to adhere to the orthodox rule barring use of prior inconsistent statements as probative evidence. *See* compilations in 3A Wigmore, *Evidence*, § 1018 (Chadbourn rev. 1970, 1991 Supp.); and J. Hilliard, Note, *Substantive Admissibility of a Non–Party Witness' Prior Inconsistent Statements: Pennsylvania Adopts the Modern View*, 32 Vill.L.R. 471, 489–491 (1987). Sixteen states have adopted for criminal proceedings the so-called "modern rule," by which the prior inconsistent statement is admissible substantively, provided the declarant is present at trial and subject to cross-examination. *See, e.g., State v. Moran*, 151 Ariz. 378, 728 P.2d 248, 250 (1986); *People v. Strickland*, 11 Cal.3d 946, 114 Cal.Rptr. 632, 636–637, 523 P.2d 672, 676–677 (1974); *Gardiner v. State*, 252 Ga. 422, 314 S.E.2d 202, 203–204 (1984); *LaPierre v. State*, 108 Nev. 528, 836 P.2d 56, 58 (1992). *See* compilations in 3A Wigmore, *supra*, § 1018; and Hilliard, *supra*, at 491–492.

The modern rule is widely supported by the commentators. McCormick asserts that the availability of cross-examining the declarant·satisfies the aim of the hearsay rule to exclude untrustworthy evidence:

> [T]he witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. It will go hard, but the two questioners will lay bare the sources of the change of face, in forgetfulness, carelessness, pity, terror or greed, and thus reveal which is the true story and which the false. It is hard to escape the view that evidence of a previous inconsistent statement, when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony.

C. McCormick, *The Turncoat Witness: Previous Statements as Substantive Evidence*, 25 Tex.L.Rev. 573, 577 (1947). *Accord* 3A Wigmore, *supra*, § 1018(b) (because purpose of hear-

say rule is satisfied when witness is present and subject to cross-examination, former extrajudicial statement should be granted substantive value).

Supporters of the modern rule have long rejected the notion that the trier of fact must observe contemporaneously the declarant's demeanor when making the out-of-court statement. Judge Learned Hand aptly observed that when a jury decides that what a witness says now is not the truth, but what he said before was truthful, they nonetheless are deciding from what they see and hear of that person in court. *Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir.1925). Some 30 years later Judge Hand returned to this theme:

> It is one thing to put in a statement of a person not before the jury: that is indeed hearsay bare and unredeemed. But it is quite a different matter to use them when the witness is before the jury, as part of the evidence derived from him of what is the truth, for it may be highly probative to observe and mark the manner of his denial. . . . Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite.

*United States v. Allied Stevedoring Corp.*, 241 F.2d 925, 933 (2d Cir.), *cert. denied*, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957).

Two other reasons support the probative use of prior inconsistent statements. As the earlier statement is always nearer—and often much nearer—to the event in question, the memory is fresher, and the statement is likely to be more complete and more accurate. 2 *McCormick on Evidence*, § 251, at 119 (4th ed. 1992). Second, the modern rule eliminates the need for a limiting instruction which asks jurors to carry out the difficult task of separating substantive proof from impeachment evidence bearing solely on a witness's credibility. *Id.* at 120. This distinction has been called "a mere verbal ritual" and "a pious fraud." *See*, respectively, McCormick, *The Turncoat Witness, supra*, at 580; E. Morgan, *Hearsay Dangers and the Application of the Hearsay Con-*

*cept,* 62 Harv.L.Rev. 177, 193 (1948). Justice Cardozo said of presenting to a jury evidence that is admissible for one purpose but not for another, "[d]iscrimination so subtle is a feat beyond the compass of ordinary minds." *Shepherd v. United States,* 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933). In the opinion of one author, intuition and good sense indicate that the jury will not merely weigh the credibility of testimony, but will determine which of the witness's two stories is true, thus deciding the substantive issue. McCormick, *The Turncoat Witness, supra,* at 581.

The drafters of the American Law Institute adopted the modern rule permitting probative admission of extrajudicial statements when the declarant was available for cross-examination. Model Code of Evidence Rule 503(b) (1942). The Commissioners on Uniform State Laws did the same. Unif. R.Evid. 63(1) (1953). The Advisory Committee on Rules of Evidence of the United States Supreme Court incorporated the modern view in its proposed Federal Rule of Evidence 801. 56 F.R.D. 183, 293 (1972). The Committee reasoned that the missing oath, cross-examination, and chance to observe demeanor when the prior statement was made could all be supplied by the later examination at trial. *Id.* at 295–296. The Committee agreed with the assessment of the California Law Revision Commission that because it was made nearer in time to the events in question and is less prone to illegitimate external influences, "the inconsistent statement is more likely to be true than the testimony of the witness at trial." *Id.* at 296.[6]

There is no need for this Court to embrace the fully modern view of this question now, for there exists another option precisely suiting the facts of the instant case. In five states, a prior inconsistent statement may be used as substantive evidence when that statement was reduced to a writing signed or

---

**6.** The federal rule that eventually emerged from Congress will figure later in our discussion of prior grand jury testimony.

adopted by the declarant, and the declarant is a witness at trial and subject to cross-examination. This approach is codified by a formal rule in Hawaii [7] and by statute in Illinois, which adds an additional requirement that the statement be based on the declarant's personal knowledge.[8] Two states have established the rule by case law. *See Com. v. Lively*, 530 Pa. 464, 610 A.2d 7, 10 (1992); *State v. Whelan*, 200 Conn. 743, 513 A.2d 86, 92, *cert. denied*, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986) (with requirement that declarant have personal knowledge of the facts stated). New Jersey has reached its result by the joint operation of a formal rule of evidence and judicial decision. *See State v. Mancine*, 124 N.J. 232, 590 A.2d 1107, 1115 (1991).

---

7. Haw.R.Evid. 802.1(1) (1992 Cum.Supp.) reads in pertinent part:

The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1) *Inconsistent statement.* The declarant is subject to cross examination concerning the subject matter of his statement, the statement is inconsistent with his testimony ... and the statement was:

(A) Given under oath subject to the penalty of perjury ...; or

(B) Reduced to writing and signed or otherwise adopted or approved by the declarant; or

(C) Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement.

8. The Illinois statute reads in pertinent part:

Admissibility of Prior Inconsistent Statements.

In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath ..., or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement ..., or

(C) the statement is proved to have been accurately recorded by ... electronic means of sound recording.

Ill.Ann.Stat. ch. 725, para. 5/115–10.1 (Smith–Hurd 1992).

■ In that it offers additional protection to the rights of an accused, this intermediate course is a wise one. We hold that the factual portion [9] of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. To the extent it is inconsistent with this holding, our opinion in *Mouzone v. State, supra,* 294 Md. at 701–02, 452 A.2d 661, is overruled.

■ Harris, McCormick, and Brown all were interviewed about events they said they had observed first hand. They provided full, descriptive answers, rather than responses of "Yes" or "No," to the questions asked. The questions were not unduly leading. Detectives committed their questions and the declarants' answers to paper as literally as possible; this technique gave little room for a subjective interpretation of what was said. The witnesses expressly acknowledged the contents of the written statements to be true and accurate, and then signed them. The witnesses were present at trial for cross-examination and thus available to explain, if they could, the inconsistencies between their trial testimony and the prior statements. These factors offered adequate guarantees that the substance of those statements was of probative value.

### The Grand Jury Testimony

In addition to those jurisdictions that take the broad, modern view concerning probative use of prior statements, another 20 states have adopted the federal model. *See* the compilations in 4 Weinstein & Berger, *Weinstein's Evidence, supra,*

---

9. A prior inconsistent statement may contain inadmissible opinions or conclusions of the witness, or hearsay, in addition to a recitation of the facts about which the witness claimed first-hand knowledge. In such case, inadmissible portions of the statement should be redacted. The record does not disclose that any objection on that ground was made in this case.

at pages 801–165—801–183; 3A Wigmore, *supra,* § 1018. Federal Rule of Evidence 801(d)(1)(A) reads:

**(d) Statements which are not hearsay**

A statement is not hearsay if—

**(1) Prior statement by witness**

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.

As originally designed by the Advisory Committee and submitted by the Supreme Court to Congress, the proposed rule, in keeping with the modern view, imposed no qualifying conditions on the prior inconsistent statement. The Senate endorsed the proposal. Sen.Rep. No. 1277, 93rd Cong., 2d Sess. 15–16 (1974), 1974 U.S.C.C.A.N. 7051, 7062–7063. *See generally* M. Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613, and 607,* 75 Mich.L.Rev. 1565, 1575–1582 (1977) (recounting legislative history).

The House of Representatives, however, sought to limit the evidentiary use of prior inconsistent statements even when the declarant was subject to cross-examination at trial. The House did so by adding the orthodox assurances of reliability. Under the House proposal, prior statements would have been admissible substantively only if made under oath, subject to the penalty of perjury, and subject to contemporaneous cross-examination when the statements were first made. *See* H.R.Rep. No. 650, 93rd Cong., 1st Sess. 13 (1973), 1974 U.S.C.C.A.N. 7075, 7086–7087.[10]

The differences between the Senate and House of Representatives were compromised in the final enactment of the rule, which provided that prior inconsistent statements are admissi-

---

**10.** The House Report acknowledged some support for the original proposal submitted by the Supreme Court based on the need to counteract the effect of witness intimidation in criminal cases. *Id.*

ble substantively only if made at a trial, hearing, deposition, or other proceeding under oath and subject to penalty of perjury. *See* Conf.Rep. No. 1597, 93rd Cong., 2d Sess. 10 (1974), 1974 U.S.C.C.A.N. 7098, 7103–7104. The Conference Report stated that the rule as adopted applies to statements before a grand jury. *Id.*

The rationales underlying Fed.R.Evid. 801(d)(1)(A) are clear. The requirement of a formal context such as a judicial hearing or grand jury proceeding assures that the declarant did indeed make the prior statement. There will be no doubt that it was accurately recorded and transcribed. The requirements of an oath and testimony given under penalty of perjury discourage lying, reminding the declarant of punishment by both supernatural and temporal powers. *See United States v. De Sisto,* 329 F.2d 929, 934 (2d Cir.), *cert. denied,* 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). The formal setting, oath, and the reminder of perjury all convey to the declarant the dignity and seriousness of the proceeding, and the need to tell the truth. Congress's decision to abandon the requirement of contemporaneous cross-examination harmonized the rule with the consensus prevailing among commentators and jurists that was discussed above.

■ In sum, a statement given before a grand jury is made in an atmosphere of formality impressing upon the declarant the need for accuracy; and it will be memorialized in a manner that eliminates concerns about whether the statement was actually made. *Com. v. Daye,* 393 Mass. 55, 469 N.E.2d 483, 494 (1984). The declarant must also, of course, be present as a witness at trial to be tested by cross-examination in regard to the former grand jury appearance and its contents. When all of these conditions have been met, due process of law is satisfied. The grand jury testimony of Harris and McCormick in the instant case properly could have been considered by the jury as substantive evidence.

## IV

■ All of the variations upon the rule permitting probative use of out-of-court identifications and statements require

that the declarant be present at trial for cross-examination. Petitioners argue that the witnesses' claimed loss of memory at trial about past events effectively denied the defense any real chance to cross-examine them about their out-of-court identifications and statements. Both the facts and the law refute that argument.

Harris, McCormick, and Brown did not uniformly testify that they had no memory of their sessions with police or the grand jury in which they made the identifications or statements. Instead, they remembered some parts of these earlier events, did not remember others, and outright denied or repudiated other parts. Their lapses of memory conspicuously occurred whenever the questions at trial approached matters potentially implicating Nance and Hardy in the murder. The tendency of unwilling or untruthful witnesses to seek refuge in forgetfulness is well recognized. 2 *McCormick on Evidence, supra,* § 251, at 121. When witnesses display such a selective loss of memory, a court may appropriately admit their prior statements. *State v. Lenarchick,* 74 Wis.2d 425, 247 N.W.2d 80, 90–91 (1976); *State v. Osby,* 246 Kan. 621, 793 P.2d 243, 250 (1990). Witnesses who are not actually available for cross-examination despite their presence in court are, for example, those who refuse to testify by asserting the spousal privilege or the privilege against self-incrimination. *See People v. Redd,* 135 Ill.2d 252, 142 Ill.Dec. 802, 837, 553 N.E.2d 316, 351 (1990). That was not the case here.

The United States Supreme Court has held that evidence of a prior, out-of-court identification is not barred when the identifying witness is unable, because of memory loss, to explain the basis for the identification. *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). In language broadly applicable to the instant case, the Court stated that: "The Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* at 559, 108 S.Ct. at 842, emphasis in original, quoting *Kentucky v. Stincer,* 482 U.S.

730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987). The Supreme Court added with respect to Fed.R.Evid. 801:

Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions. Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists. But that effect is not produced by the witness' assertion of memory loss—which ... is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement.

*Owens, supra,* 484 U.S. at 561–562, 108 S.Ct. at 844.

All three witnesses were extensively cross-examined by the defense at trial. They were eager to offer testimony that attenuated any link between Petitioners and the crime. They were afforded an ample opportunity to explain or deny the inconsistencies between their trial testimony and their prior statements to police and the grand jury. This they did in a number of ways. They testified that police had misinterpreted their prior remarks, falsely recorded them, or elicited them by coercion. Harris and McCormick also suggested that heroin intoxication had eradicated their memories.

In brief, the witnesses' testimony served largely to cast doubt on the State's evidence and thereby to exculpate the defendants at trial, which is the aim of effective cross-examination by the defense in a criminal case. The Petitioners cannot now complain they were somehow hurt by the very testimony that sought to discredit the prior identifications and statements. *See California v. Green,* 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (the most successful cross-examination at the time the prior statement was made could hardly hope to accomplish more than has already been accomplished by the fact that the witness is now telling a different story favorable to the defendant). The essence of Petitioners' complaint is that the jurors chose to accept the

witnesses' earlier version of events incriminating Nance and Hardy in preference to the "sanitized" trial testimony. That choice lay entirely within the jury's province of distinguishing truth from falsehood. Taken collectively, the out-of-court identifications, statements to detectives, and grand jury testimony were more than sufficient to support the jury's findings of guilt.

JUDGMENTS AFFIRMED, WITH COSTS.