655 A.2d 1345

Michael STEWART

v.

STATE of Maryland.

No. 1006, Sept. Term, 1994.

Court of Special Appeals of Maryland.

March 31, 1995.

274

Paul C. Vitrano, Assigned Public Defender of Washington, DC (Stephen E. Harris, Public Defender of Baltimore, and Jennifer P. Lyman, Assigned Public Defender of Washington, DC, on the brief), for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Argued before MOYLAN, WENNER and SALMON, JJ.

MOYLAN, Judge.

In *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), the Court of Appeals changed dramatically the evidentiary landscape of Maryland. In this case, we are positioned to fill in, by way of a square holding, a part of the new map, and to do so in the way anticipated by prescient *dicta* in *Bradley v. State,* 333 Md. 593, 607, 636 A.2d 999 (1994).

The appellant, Michael Stewart, was convicted by a Baltimore City jury, presided over by Judge Elsbeth Levy Bothe, of murder in the first degree and the use of a handgun in the commission of a crime of violence. On this appeal, the appellant raises three contentions:

1) The State's use of a witness's prior out-of-court statement, ostensibly under the authority of *Nance,* violated the dictates of *Spence v. State,* 321 Md. 526, 583 A.2d 715 (1991).

2) The State unconstitutionally failed to provide the defense with exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3) The prosecutor's improper remarks during closing argument prejudiced the appellant.

■ On July 9, 1993, at 2872 West Lanvale Street in Baltimore, James "Man" Brandon was shot twice and killed. A key witness was George Booth. Approximately one month after the shooting, Booth was presented with a photographic array by Detective Corey Belt. Booth chose the appellant's photograph and identified him as the person who shot "Man."

Booth wrote in his own words, "I'm positive that he was the one who shot 'Man,'" and then placed his initials and signed his name next to the appellant's photograph. In a second photo array presented to him, Booth again identified the appellant as the shooter. Booth wrote in his own words that before the shooting, the appellant "came around the corner and said 'What's .up?'" and then left.

During an interview conducted after the photographic array procedure, Booth told Detective Belt that he knew the shooter as "Mike." En route to the grand jury, Booth further indicated that Mike's nickname was "Honky Tonk." After his arrest, the appellant himself indicated that his nickname was, indeed, "Honky Tonk." Although Detective Belt characterized Booth as not very cooperative, Booth's statement to the police was reduced to writing and both initialled and signed by him.

When called as a State's witness at trial, Booth turned out to be a classic example of what the *Nance* opinion refers to as a "turncoat witness." Booth testified that, notwithstanding his earlier statements to the police, he did not recognize Brandon's murderer as someone from the neighborhood. He further asserted that the shooter was someone he had never seen before. He explained away his earlier photographic identification as something that the police had "hounded him" into doing. He similarly explained away his comment on the photograph, the fact of which he acknowledged, that he was "positive" that it was the appellant who had shot Brandon.

Booth acknowledged that he had gone before the grand jury and there testified that Mike, better known as "Honky Tonk," had displayed a gun to him prior to the shooting and then told him to "take a walk." Booth acknowledged having testified before the grand jury that the appellant was the shooter. He also testified, inexplicably, that he had told the truth before the grand jury but then, on cross-examination, testified that the appellant was not the shooter.

The deployment was opportune for the State, through Detective Belt, to unlimber every piece of ordnance in the *Nance* arsenal: 1) Booth's extrajudicial identification of the appellant,

2) Booth's written and signed statement to the police, and 3) Booth's testimony before the grand jury. All three salvos were then fired in rapid succession. The appellant accepts, under *Bedford v. State*, 293 Md. 172, 176–79, 443 A.2d 78 (1982), the first "hit," but takes aggrieved umbrage at the second and third.

For the admission of both 1) Booth's written and signed statement to the police and 2) Booth's testimony before the grand jury, *Nance's* threshold conditions were met. Booth was present at the trial as an available witness and Booth was subject to cross-examination by the appellant. With respect to the statements to the police, *Nance's* requirement is that the

> statement was reduced to a writing signed or adopted by the declarant, and the declarant is a witness at trial and subject to cross-examination.

331 Md. at 567–68, 629 A.2d 633. *Nance* established that a prior inconsistent statement is admissible as substantive evidence if the declarant "is subject to cross-examination at the trial where the prior statement is introduced." 331 Md. at 569, 629 A.2d 633.

With respect to the admissibility of Booth's grand jury testimony, *Nance* similarly held:

> The declarant must also, of course, be present as a witness at trial to be tested and be cross-examined in regard to the former grand jury appearance and its contents.

331 Md. at 571, 629 A.2d 633.

In turning to the particular requirements for the admissibility of a prior statement to the police, as an exception to the hearsay rule, *Nance* was satisfied. 331 Md. at 564–69, 629 A.2d 633. The statement to the police was based on Booth's own knowledge of the facts. It was reduced to writing by Booth himself in his own words. It was adopted by him, initialled by him, and signed by him. In terms of its trustworthiness under those circumstances, *Nance* held squarely:

> We hold that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as

substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. (Footnote omitted.)

331 Md. at 569, 629 A.2d 633.

In terms of the particular requirements for the admissibility of Booth's grand jury testimony, as an exception to the hearsay rule, *Nance* was again satisfied. 331 Md. at 569–71, 629 A.2d 633. Booth testified under oath and subject to the penalty of perjury. His grand jury testimony was meticulously recorded and transcribed. In terms of the trustworthiness of the hearsay under those circumstances, *Nance* reasoned:

The requirement of a formal context such as a judicial hearing or grand jury proceeding assures that the declarant did indeed make the prior statement. There will be no doubt that it was accurately recorded and transcribed. The requirements of an oath and testimony given under penalty of perjury discourage lying, reminding the declarant of punishment by both supernatural and temporal powers. The formal setting, oath, and the reminder of perjury all convey to the declarant the dignity and seriousness of the proceeding, and the need to tell the truth....

In sum, a statement given before a grand jury is made in an atmosphere of formality impressing upon the declarant the need for accuracy; and it will be memorialized in a manner that eliminates concerns about whether the statement was actually made. (Citation omitted.)

331 Md. at 571, 629 A.2d 633.

In scrambling to ward off the blows unleashed by *Nance,* the appellant crouches behind the now rusty shield of *Spence v. State,* 321 Md. 526, 583 A.2d 715 (1991). It affords scant protection. Its inefficacy in the present evidentiary world is that it is a relic from the pre-*Nance* days when a prior inconsistent statement could be used only to impeach testimonial credibility. As an impeaching weapon, the prior inconsistent statement could be unsheathed only when the party

wielding it was genuinely surprised by the "turncoat" testimony. "Impeachment should not be used as a sword to place otherwise inadmissible evidence before the jury." *Bradley v. State*, 333 Md. at 606, 636 A.2d 999. If the party sponsoring the witness, or asking the court to sponsor a witness, knew in advance that testimonial treachery was afoot, the proper defensive tactic was simply to refrain from calling the unreliable witness.

In pure theory, the only legitimate purpose of impeachment is to avoid registering negative points, not to score affirmative points. 6 Lynn McLain, *Maryland Evidence* § 607.1(b), at 37 (1987) ("Evidence which is admitted to impeach a witness comes in only to detract from the witness's credibility and not as substantive proof of the facts being litigated."). In that sense, there is generally no need to impeach what can more readily be avoided. When the maximum legitimate score that the sponsor of an inconstant witness can achieve, through impeachment, is zero, a sponsor, forewarned of the inconstancy, can most easily, and with no troublesome side effects, achieve that maximum score by not putting the witness on the stand. "Impeachment ... protects a party from unfavorable testimony by neutralizing that testimony." *Bradley v. State*, 333 Md. at 605, 636 A.2d 999. A testimonial non-event self-evidently requires no impeachment.

In that simple pre-*Nance* world, the prior inconsistent statements were never received for their substantive content. There always lurked in the evidentiary shadows, however, the fear that the impeaching words, though not ostensibly offered for their truth, might nonetheless work, consciously or subconsciously, some spill-over substantive impact on the ears of the jurors. Wily trial advocates leaped eagerly on every such opportunity. It was to forestall just such exploitation and abuse of the impeachment device that the limiting strictures of *Spence* were imposed. The Court of Appeals described the evil it sought to ward off:

It is obvious that the prosecutor's sole reason for prevailing on the court to call Cole as a court's witness was to get before the jury Cole's extrajudicial hearsay statement impli-

cating Spence. The prosecutor knew that Cole's testimony would be exculpatory as to Spence. The inescapable conclusion is that the State, over objection, prevailed on the court to call a witness who would contribute nothing to the State's case, for the sole purpose of "impeaching" the witness with otherwise inadmissible hearsay.

The State concedes, as it must, that Detective *Naylor's testimony* about Cole's statements regarding Spence's participation *did not fall within the hearsay exception and was inadmissible as substantive evidence* against Spence ... The State cannot, over objection, have a witness called who it knows will contribute nothing to its case, *as a subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay evidence.* (Emphasis supplied.)

321 Md. at 530, 583 A.2d 715. *See also Wright v. State,* 89 Md.App. 604, 598 A.2d 1214 (1991), *cert. denied,* 325 Md. 620, 602 A.2d 711 (1992).

Under the pre-*Nance* regime, and even today when the prior inconsistent statement is offered *only* as an impeachment device, *Bradley v. State,* 333 Md. 593, 636 A.2d 999 (1994), there always existed the chronic danger that the jurors might use the statement, whatever the judge's admonitions to the contrary, for a purpose other than that for which it had been formally received. The courts, therefore, were understandably chary about permitting the introduction of prior inconsistent statements and sought to keep the process as antiseptic as possible. Hence, *Spence* and *Wright.*

In such an antiseptic world, this appellant would have had an unassailably valid complaint. When the State called Booth as its second witness on the first day of trial, it was not at all surprised that he had by that time become, in the words of *Nance,* a "turncoat witness." Booth had already unfurled his new colors a full twenty-four hours earlier, when testifying, under oath, at a pretrial hearing on the appellant's motion to suppress an identification of him made by Booth. At that hearing, Booth testified that the appellant was not the shooter and that Booth had been coerced by the police into selecting

the appellant's photograph from the array. As soon as Booth was called as a trial witness, the appellant immediately objected, seeking to interpose *Spence* as a bar to the anticipated claim by the State of mock surprise and consequential entitlement to impeach. The objection was overruled.

For whatever solace it affords the appellant, we agree with him that *if Spence* applied, *Spence* would have been violated. If the only value at trial of Booth's written statement to the police and his grand jury testimony had been to impeach Booth's trial testimony, the State would have been as guilty of subterfuge in calling Booth as it was guilty of subterfuge, in the *Spence* case, in calling the witness Cole. Were the State today still chargeable with such indirection, the deliberate use of a ploy to get before the jurors substantive evidence that they should not consider, the State would call down on its head the full fury of *Spence's* condemnation:

> The sole value to the State from Cole's testimony was that it opened the door for the "impeaching" testimony of Cole's prior inconsistent statement. The statement was one which the State knew Cole would not acknowledge making. *The obvious purpose* of calling Cole *was* not because Cole would contribute anything to the State's case, but *because Cole's testimony would enable the State to place Cole's prior statement before the jury* and to call Detective Naylor to "impeach" Cole. *The improper prejudicial effect is obvious.* We must conclude that Cole's statement and Naylor's testimony about Cole's hearsay statement implicating Spence was not offered because the State needed to impeach a witness it insisted be called—*the hearsay was really being offered as evidence of Spence's guilt.* (Emphasis supplied.)

321 Md. at 530–31, 583 A.2d 715. Equally pertinent would have been the imprecation from *Wright v. State*:

> Here, the State knew exactly what [the witness's] testimony would be. Prior to trial [the witness] had repeatedly told the State he would testify ... that he did not see appellant running with a gun from the scene of the shooting. The

Court of Appeals did not accept this "subterfuge" in *Spence*, and we will not accept it here.

89 Md.App. at 610, 598 A.2d 1214.

According to the pre-*Nance* ethos, the State's sin was in creating a risk, without any necessity for such risk or any countervailing purpose to be served, that something given to the jurors only in its non-hearsay capacity might be considered by them, in their laymen's innocence, in its hearsay capacity. Failing to appreciate the limited purpose of impeachment, they might, in untutored confusion, actually consider the prior statements as substantive evidence of guilt.[1] Only necessity, based on genuine surprise, could ever justify even running such a risk. That was the lesson of *Spence* and *Wright*.

In *Spence v. State*, the prosecutor candidly expected the witness to testify adversely to the State, notwithstanding earlier helpful statements to the police. The prosecutor, to avoid the then-prevailing Voucher Rule, asked that the witness be called as a court's witness for the express purpose of permitting the State to introduce the prior inconsistent statements for the ostensible purpose of impeaching the witness's testimonial credibility:

The prosecutor indicated Cole would testify that Spence was not involved, but that *his purpose for calling Cole was to get before the jury prior out-of-court statements* Cole had made to police officers that, in fact, Spence was one of the perpetrators of the burglary and robbery of Mrs. Rowe.... The State then requested that the court call Cole as a court's witness since Cole was going to state that Spence was not with him when the crime was committed, and the

---

1. *See, e.g., United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975): The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for them to distinguish between impeachment and substantive evidence.

prosecutor wanted to impeach that testimony. (Footnote omitted.) (Emphasis supplied.)

321 Md. at 528, 583 A.2d 715. The prosecutor obviously had a hidden, albeit not well hidden, agenda and was clearly seeking to "milk" the prior statements for something other than mere impeachment. The Court of Appeals characterized and condemned the subterfuge:

> This blatant attempt to circumvent the hearsay rule and parade inadmissible evidence before the jury is not permissible.

321 Md. at 530, 583 A.2d 715.

The heart of the thing we condemned in *Wright v. State* was the potential misuse of impeaching evidence as substantive evidence of guilt. "[W]e are faced with an attempt, by calling Day as a court's witness, to admit an inconsistent hearsay statement as substantive evidence of appellant's guilt." 89 Md.App. at 609–10, 598 A.2d 1214. "The prejudicial effect of Day's testimony was that it was 'really being offered as evidence of appellant's guilt,' not to impeach a witness the State insisted upon being called as a court's witness." 89 Md.App. at 610, 598 A.2d 1214.

All of this, however, is quite beside the point when, *a la Nance,* the prior statements are openly offered and received as flat-out substantive evidence of guilt. There is no danger that something offered for one purpose will be misused for another and ulterior purpose. By definition, there can be no indirection or subterfuge, for the worst that could happen to a defendant is already officially authorized.

The change wrought by *Nance* was far more than the functional shift from the Hearsay Rule Inapplicable to the Hearsay Rule Satisfied. It was more than a change from the use of out-of-court utterances as evidence of inconsistency to the use of out-of-court declarations as the substantive equivalent of in-court testimony. *Nance* also eliminated the element of surprise as the required trigger for the admissibility of the out-of-court statements, for the requirement of surprise is but an attribute of the impeachment function.

The *Nance* opinion set out with punctilious specificity all of the requirements for the admission of the out-of-court statements and neither mentioned nor alluded to any notion of surprise. Since there was no longer any danger that evidence offered for one purpose might be misused for another, the element of surprise, as an instance of necessity, had lost all relevance. Indeed, the provisions of the new Md. Rule of Evid. 5–802.1(a) make no mention of surprise:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement.

The Rule of *Nance* does not incorporate the requirement of surprise spelled out by *Spence* and *Wright.* The requirement of surprise is, to be sure, still very much alive, even post-*Nance,* when the out-of-court statements are received in their non-hearsay capacity for the *exclusive* purpose of impeaching testimonial credibility. (We stress the adjective "exclusive," because even a *Nance*-qualified use of a prior inconsistent statement as substantive evidence still retains, of course, a coincidental and residual capacity to impeach testimonial credibility. *Sheppard v. State,* 102 Md.App. 571, 576, 650 A.2d 1362 (1994)).

■ Post–*Nance,* it is no longer true that a party, anticipating that a prospective witness has already turned coat, will, thereby, be guilty of impermissibly calling a witness "who it knows will contribute nothing to its case." *Spence v. State,* 321 Md. at 530, 583 A.2d 715. Provided that *Nance's* express prerequisites have been satisfied, a party may call a witness,

fully anticipating (indeed, even hoping for) a miserable testimonial performance, for the exclusive purpose of using that performance, or non-performance, as the launching pad for the introduction of 1) evidence of a prior identification by that witness, 2) the witness's prior inconsistent statement to the police, 3) the witness's grand jury testimony, or 4) any combination of the foregoing. It is no longer true that such a witness "contributes nothing to the case." Under *Nance*, even a perjurious witness may now, simply by serving as a vehicle or a medium for the introduction of other evidence, contribute a great deal to the case.

*Bradley v. State*, 333 Md. 593, 636 A.2d 999 (1994), is a post-*Nance* case. It, like *Nance*, involved a "turncoat witness," one Adrian Bradley, cousin of the defendant Gerrid Bradley. Adrian Bradley had given a pretrial statement to the police in which he recounted a telephone call from his cousin (the defendant), in the course of which his cousin acknowledged having stolen the robbery victim's car and, indeed, bragged about it.

By the time of trial, however, Adrian Bradley had had a change of heart and denied ever having made such statements to the police. The State "was not surprised by Adrian Bradley's denial." 333 Md. at 597, 636 A.2d 999. It fully anticipated his trial performance. First setting him up by eliciting from him his repudiation of his earlier statements to the police, the State then called a detective to impeach Adrian Bradley's testimonial credibility. The Court of Appeals relied on *Spence v. State* and held that the element of surprise was missing and that the detective's recounting of Adrian Bradley's prior out-of-court statements for impeachment purposes was, therefore, reversible error.

Judge Chasanow then very carefully pointed out, 333 Md. at 607, 636 A.2d 999, "[O]ur holding does not affect *Nance v. State*." He quoted from *Nance* its threshold requirement that an inconsistent out-of-court statement, to be deemed sufficiently trustworthy to be offered as substantive evidence of guilt, must, *inter alia*, be reduced to writing and then signed

or otherwise adopted by the declarant. Adrian Bradley's statement to the police did not satisfy that threshold requirement and the out-of-court statement in the *Bradley* case was, therefore, not received as substantive evidence of guilt. Judge Chasanow pointed out, however, that if a prior out-of-court statement had satisfied *Nance's* threshold requirements, it would have been admissible as substantive evidence, notwithstanding the demonstrated absence of any element of surprise:

> *Had Adrian Bradley's prior statement been reduced to writing and signed, thus making it admissible as substantive evidence rather than solely impeachment evidence, it would have been admissible.* In the instant case, however, the prior statement by Adrian Bradley was not reduced to a writing and signed or adopted by him and, thus, it was not admissible as substantive evidence. Detective Sizemore simply made notes summarizing his conversation with Adrian Bradley. Thus, the only possible purpose in admitting the prior inconsistent statement was to impeach and thereby neutralize Adrian Bradley's testimony ... (Emphasis supplied.)

333 Md. at 607, 636 A.2d 999.

In this case, *Nance* is controlling. Its express prerequisites having been satisfied, Booth's prior statement to the police and Booth's grand jury testimony were properly admitted as substantive evidence of the appellant's guilt. *Spence* is inapposite. The State's lack of surprise at Booth's change of heart was immaterial.

■ The appellant's remaining contentions will not detain us long. He charges the State with the failure to provide the defense with exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The whole contention swirls about one Kevin Black, who was standing in the general vicinity of the crime just before the fatal shooting took place. Kevin Black took the stand as a defense witness. He testified before the jury that he knew the appellant "from the neighborhood" and that the appellant

was not on the crime scene on the day of the shooting. Kevin Black testified affirmatively that he saw the shooter but that the appellant was not the shooter. He testified that when he initially participated in a pretrial photographic identification procedure, the police attempted to intimidate him into identifying the appellant as having been at the crime scene but failed to do so.

Specifically at issue was a second occasion when Kevin Black was called in for a photographic identification procedure several months later. Kevin Black failed to pick anyone out of that second photographic array even though the appellant's photograph was included therein. The appellant now claims that the failure on the part of the State to reveal to him the fact of that non-identification was a *Brady* violation. The point is utterly without merit.

Kevin Black was called as a defense witness. He was as fully able to apprise the defense of what happened at any of the identification procedures as was the State. On direct examination, he alluded to a second identification procedure but the defense failed to follow up by asking him to describe it in detail. The fact of the non-identification, moreover, was fully revealed to the jury. This was not remotely a case involving ultimate suppression, which was the body blow that engaged the concern of *Brady*.

The appellant offers, by way of showing prejudice, the argument that had he known of this ostensible weakness of the State's case, he might, as a matter of trial tactics, have declined to rely on an "unattractive" alibi defense, which probably "backfired" on him. Without anguishing further over something that is demonstrably not a *Brady* problem, we shall simply note the distinction between ultimate suppression and tactical surprise made by *DeLuca v. State,* 78 Md.App. 395, 424–25, 553 A.2d 730, *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989):

> *Brady and its progeny deal* not, as here, with discovery sufficiently timely to enable the defense team to calibrate more finely its trial tactics but *with the very different issue*

*of withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence* which, had the jury known of it, might well have produced a different verdict. *Suppression contemplates the ultimate concealment of evidence from the jury,* not the tactical surprise of opposing counsel. *The Brady sin is hiding something and keeping it hidden,* not hiding something temporarily in order to surprise someone with a sudden revelation. Even if the latter were just as sinful, it would be a different sin with a different name. The appellant seems to be giving us a discovery issue—arguably necessary to discovery to assure proper trial preparation—cloaked as a suppression issue. (Footnote omitted.) (Emphasis supplied.)

We are not suggesting that there was a discovery violation in this case. We are simply pointing out that that is not the issue that is before us. The appellant urges a *Brady* violation. There was no *Brady* violation.

 The appellant's final contention is that the prosecutor's closing argument improperly and insensitively impugned his honor. He cites five instances. With respect to the first four of those, however, there was no objection. There is, therefore, nothing preserved for appellate review. *Stevenson v. State,* 94 Md.App. 715, 730, 619 A.2d 155 (1993); *Purohit v. State,* 99 Md.App. 566, 586, 638 A.2d 1206 (1994). With respect to the single instance where objection was made, it dealt with the State's insinuation to the jury that the appellant "concocted" his alibi defense.

The appellant was not arrested until October 27, 1994, three-and-one-half months after the day of the shooting. Notwithstanding that three-and-one-half-month passage of time, the appellant, immediately after his arrest, told the police, with certain assurance and phenomenal power of recall, that at the time of the shooting he had been with Sandra Watkins, the mother of one of his children. Sandra Watkins, however, testified that the appellant had not been with her at the time of the shooting. "La dame est mobile." She observed further

that the appellant divided his time "between her and her rival during that period."

At trial, the appellant was forced to switch tactics and, with even more phenomenal power of recall, take refuge in having been at the time of the shooting in the alternative company of Donyette McCray, the mother of his other child. On the stand and under oath, he glibly excused his earlier "lie" to the police by explaining that he had had to fabricate that alibi because he "did not want to draw unnecessary attention to Ms. McCray's house, where he had held drugs." It did suggest a willingness to bend the truth.

He is now sorely aggrieved that the State would suggest to the jury that he would be willing to manipulate his consorts and their powers of memory for self-serving purposes and that he would deign to "concoct" an alibi defense. It is dispositive to note that we cannot conceive of any rational closing argument by the State that would have done anything less. *Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707 (1974); *Henry v. State,* 324 Md. 204, 230, 596 A.2d 1024 (1991).

*JUDGMENTS AFFIRMED;*

*COSTS TO BE PAID BY APPELLANT.*