636 A.2d 999

**Gerrid Kenneth BRADLEY**

v.

**STATE of Maryland.**

**No. 44, Sept. Term, 1993.**

Court of Appeals of Maryland.

Feb. 8, 1994.

594

Martha G. Weisheit, Asst. Public Defender, Stephen E. Harris, Public Defender, on brief, Baltimore, for petitioner.

Thomas K. Clancy, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Annabelle L. Lisic, Asst. Atty. Gen., on brief, Baltimore, for respondent.

Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE *, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In the instant case, Gerrid Kenneth Bradley (defendant) contends that a highly prejudicial, prior inconsistent statement was improperly admitted. We agree with his contention, and because the admission of the statement was not harmless error, we shall reverse his conviction.

## I.

Bradley was charged in Prince George's County with kidnapping, armed robbery, use of a handgun in the commission of a felony or crime of violence, and related offenses. A jury trial was held on December 4 and 5, 1991. At trial, the State called several witnesses including the victim, Laura Sisk. Ms. Sisk testified that, on the evening of April 1, 1991, she was approached by a man as she exited her car at her parents' home. The man then placed a gun against her stomach, ordered her back into the car, and forced her to drive several blocks. She further testified that after she screamed the assailant ordered her out of the vehicle, grabbed her purse, and drove off in her car. In addition to Ms. Sisk's testimony, the State offered police testimony that ten days after the robbery the defendant was apprehended in the District of Columbia after fleeing from the victim's car. Ms. Sisk made an in-court identification of the defendant as the assailant. There was also evidence of a pre-trial photo identification of

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and adoption of this opinion.

the defendant by Ms. Sisk as well as a pre-trial photo misidentification.

In order to place the defendant in Ms. Sisk's car shortly after the vehicle was taken, the State proffered Ms. Sisk's phone bill, which indicated that calls were placed from her car phone to a particular phone number within one-half hour of the theft. As succinctly described by the Court of Special Appeals in its unreported opinion of the instant case, the following sequence of events then transpired at trial:

"The State ... called Adrian Bradley, appellant's cousin. He testified, on direct examination, that his home phone number [matched the number on the bill] and that he had received one or two telephone calls from appellant at that number at a time that would have been after Ms. Sisk's car had been stolen. *It was at this point, over appellant's objection, that the State elicited from Adrian Bradley that he denied telling a detective that appellant had said to him in these telephone conversations that he (appellant) had stolen a car.* Adrian Bradley also denied telling appellant in the call that he was stupid for having stolen a car.

The State called Detective Sizemore as a witness who recounted interviews with both appellant and Adrian Bradley. *In relating his conversations with the cousin, the detective[, over objection,] said that the cousin told him that appellant had bragged about stealing a ... car.*

The court instructed the jury that the testimony regarding the phone calls on the date of the offense in which appellant bragged about what he had done were to be considered only in assessing the credibility of the cousin, Adrian Bradley." (Emphasis added).

The State was not surprised by Adrian Bradley's denial that he told the detective the defendant had bragged about stealing the car in the phone conversation. Prior to this line of questioning, the prosecutor had approached the bench and advised the trial judge as follows:

"Your Honor, *I am not claiming surprise* because I have had contact with this witness in the past, but Detective

Sizemore told me that during the course of the investigation he, of course, talked to this witness and that this witness advised the detective that the Defendant had called him that evening and admitted to taking the car and that the witness's response to Mr. Bradley was that he was stupid for doing it. I have since confronted the witness about this and *he denies that that occurred.*" (Emphasis added).

Notwithstanding this information, the prosecutor was permitted to question Adrian Bradley about the telephone conversations in order to lay the foundation for impeaching Adrian Bradley with his prior inconsistent statement to the detective.

Gerrid Bradley called no witnesses on his behalf to respond to the prosecution's case. Instead, Bradley relied on cross-examining the State's witnesses. On cross-examination, Detective Sizemore revealed that, in his interviews with Gerrid Bradley, Bradley steadfastly maintained that he paid someone $70 for the stolen automobile and that he in no way participated in the robbery. The detective agreed with defense counsel's assertion that Bradley "never at any time indicated anything other than that he had not done the abduction or robbery and that stuff, but he had come into possession of this stolen car...." This formed the basis for Bradley's defense that he was merely the purchaser of stolen property.[1] The defense also emphasized Ms. Sisk's initial misidentification of Bradley in its closing argument to the jury, in support of its contention that this was simply a case of mistaken identity.

Ultimately, the jury convicted Bradley on all counts. After the counts were merged, the judge sentenced Bradley to 15 years for kidnapping, 10 additional years for robbery with a deadly weapon, and 20 years for use of a handgun to be served concurrent to the kidnapping sentence. Bradley appealed his

---

1. In closing argument, Bradley's counsel summarized the defense as follows:

"Gerrid Bradley didn't rob anyone that night, didn't kidnap anyone that night, didn't have a gun that night. He simply rented very unwisely, inappropriately or bought, came into possession of a Geo [automobile] that he ought not [to] have ... done and started using the phone and driving around joyriding...."

convictions to the Court of Special Appeals, which affirmed in an unreported opinion. Thereafter, we granted Bradley's petition for certiorari to consider whether the State improperly used his cousin's prior inconsistent statement for impeachment.

## II.

Our analysis begins with this Court's decision in *Spence v. State*, 321 Md. 526, 583 A.2d 715 (1991). The defendant in *Spence* was charged with burglary and armed robbery and was tried by a jury. During trial, the State asked the judge to call a court's witness even though the State acknowledged that the witness's testimony would exculpate, rather than implicate, the defendant. The State admitted its purpose· in calling the witness "was to get before the jury prior out-of-court statements [the witness] had made to police officers that, in fact, [the defendant] was one of the perpetrators of the burglary and robbery...." *Spence*, 321 Md. at 528, 583 A.2d at 716. Notwithstanding defense counsel's objection, the court called the witness.

As expected, the witness denied that he told the police the defendant was one of the perpetrators. Over objection, the State was then permitted to call a police detective who testified that the witness had told him that the defendant participated in the crime. On appeal, the State argued that the extrajudicial statements, though not admissible as substantive evidence, were admissible to impeach the witness. We did not agree, and observed the following:

"It is obvious that the prosecutor's sole reason for prevailing on the court to call [the] court's witness was to get before the jury [the witness's] extrajudicial hearsay statements implicating [the defendant]. The prosecutor knew that [the witness's] testimony would be exculpatory as to [the defendant]. The inescapable conclusion is that the State, over objection, prevailed on the court to call a witness who would contribute nothing to the State's case, for the

sole purpose of 'impeaching' the witness with otherwise inadmissible hearsay."

*Spence*, 321 Md. at 530, 583 A.2d at 717. We concluded that "[t]his blatant attempt to circumvent the hearsay rule and parade inadmissible evidence before the jury [was] not permissible." *Id.*[2]

We recognized the factual similarities of *Spence* to the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975). *See Spence*, 321 Md. at 531, 583 A.2d at 717 (referring to *Morlang* as the "leading case" on this issue). In *Morlang*, "the government [called] its first witness despite the fact that it was fully aware that his testimony would tend to exonerate [the defendant]. . . . The real purpose for calling [the witness] was apparently to elicit from him a denial that he had ever had any conversation with a fellow prisoner in which he implicated [the defendant]." *Morlang*, 531 F.2d at 188. The *Morlang* court, like the Court in *Spence*, refused to "permit the use of the [impeachment] rule as a subterfuge to get to the jury evidence otherwise inadmissible." 531 F.2d at 190. *See also Wright v. State*, 89 Md.App. 604, 610, 598 A.2d 1214, 1217 (1991) (applying *Spence* and explaining that "the State was setting [the witness] up as a proverbial straw man, so that on examination the State could knock [him] down with hearsay statements previously made by him"), *cert. denied*, 325 Md. 620, 602 A.2d 711 (1992).

---

**2.** The State recognizes that Maryland Rule 1–501 does not affect the viability of *Spence v. State*, 321 Md. 526, 583 A.2d 715 (1991). Rule 1–501 states that the "credibility of a witness may be attacked by any party, including the party calling the witness." At the time of Spence's trial, Rule 1–501 was not yet in effect. We stated in *Spence*, however, that even the broad language of Rule 1–501 " 'does not go so far as to permit the use of the rule as a subterfuge to get to the jury evidence otherwise inadmissible.' " 321 Md. at 531, 583 A.2d at 718 (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975)). The Committee note to Rule 5–607, a newly adopted rule of evidence which mirrors the language of Rule 1–501, recognizes this limitation by stating: "[This Rule] does not permit a party to call a witness solely as a subterfuge to place an otherwise substantively inadmissible statement before the jury." *See* 21 Md.Reg. at P–9 (Jan. 7, 1994).

■ The State argues that *Spence* and *Morlang* are inapposite to the instant case because "Adrian Bradley's value as a witness . . . was not as a vehicle to admit the prior inconsistent statement. His substantive testimony served as important evidence showing that [the defendant] was in the stolen car within one half hour after it was stolen and that [the defendant] called Adrian from the car." Because Adrian Bradley's testimony substantively aided the prosecution's case, the State maintains that the questions regarding the contents of his conversation with the defendant in no way violate *Spence.* The crux of the State's argument is that, if you call a witness for a proper purpose, you may inquire into any additional relevant area for the sole purpose of opening the door for impeachment by a prior inconsistent statement.[3] We disagree.

Although *Spence* dealt with the "calling" of a witness for the "sole purpose" of introducing, via impeachment, an otherwise inadmissible prior inconsistent statement, its rationale equally applies to the instant case. This case involves what we shall call an "independent area of inquiry." The State called Adrian Bradley to establish that he was the defendant's cousin, that his phone number corresponded with the number on the victim's car phone bill (which indicated that a call was made shortly after the car was taken), and that the defendant did indeed speak with him from the car phone. After Adrian Bradley verified all of this information on the witness stand, it was improper for the State to inquire about the contents of the telephone conversation for the sole purpose of impeaching Adrian regarding the entirely separate matter of whether or not the defendant bragged about the crime in the telephone call. The State knew that Adrian Bradley would deny that the defendant confessed to the crime, yet still questioned him concerning the alleged confession. Thus, we are led to the "inescapable conclusion . . . that the State, over objection,

---

3. In its unreported opinion of the instant case, the Court of Special Appeals accepted this argument. The intermediate appellate court concluded that the State's impeachment of Adrian Bradley was proper because he was "a legitimate witness for the State."

[questioned a witness concerning an independent area of inquiry knowing it] would contribute nothing to the State's case, for the sole purpose of 'impeaching' the witness with otherwise inadmissible hearsay." *Spence,* 321 Md. at 530, 583 A.2d at 717. In accordance with the *Spence* rationale, we hold that it is impermissible for a party in a criminal case, over objection, to venture into an independent area of inquiry solely for purposes of "circumvent[ing] the hearsay rule and parad[ing] inadmissible evidence before the jury." *Spence,* 321 Md. at 530, 583 A.2d at 717.[4]

At oral argument, the State emphasized that it could find no case law drawing the independent-area-of-inquiry distinction. We recognize that this distinction apparently has not arisen in other cases. Generally, courts look to whether the witness was called to elicit substantive evidence or whether the "primary purpose" in calling the witness was to place otherwise inadmissible hearsay before the jury through impeachment. *See, e.g., United States v. Gomez–Gallardo,* 915 F.2d 553, 556 (9th Cir.1990) ("[W]e are compelled to conclude that the government called Gutierrez for the *primary purpose* of impeaching Gutierrez's credibility to prove the substance of the charges against Gallardo." (emphasis added)); *United States v. Hogan,* 763 F.2d 697, 702 ("The prosecution ... may not call a witness it knows to be hostile for the *primary* purpose of eliciting otherwise inadmissible impeachment testimony, for

---

4. We acknowledge that there was an understandable temptation by the prosecutor to offer Adrian Bradley's prior inconsistent statement. As the Fourth Circuit Court of Appeals observed in *Morlang,* "[w]itnesses may, of course, sometimes fail to come up to the expectations of counsel and in such situations there is an understandable temptation to get before the jury any prior statement made by the witness." *Morlang,* 531 F.2d at 190. The *Morlang* court, however, continued by noting:

> "And it may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the principle that men should not be allowed to be convicted on the basis of unsworn testimony."

*Id.* Notwithstanding this "understandable temptation," the State's efforts to place highly prejudicial hearsay before the jury under the pretext of "impeachment" were in no way justified.

such a scheme merely serves as a subterfuge to avoid the hearsay rule." (emphasis in original)), *corrected in part,* 771 F.2d 82 (5th Cir.1985); *Morlang,* 531 F.2d at 190 ("The overwhelming weight of authority is ... that impeachment by prior inconsistent statement may not be permitted where employed as a *mere subterfuge* to get before the jury evidence not otherwise admissible." (emphasis added)). As noted in *McCormick on Evidence:*

> "[T]he 'mere subterfuge' or '*primary* purpose' caveat focuses upon the content of the witness'[s] testimony as a whole. Thus if the witness'[s] testimony is important in establishing any fact of consequence significant in the context of the litigation, the witness may be impeached as to any other matter testified to by means of a prior inconsistent statement." (Emphasis in original).

1 *McCormick on Evidence* § 38, at 129 (John W. Strong ed., 4th ed. 1992).

Despite the failure of other jurisdictions to recognize the distinction that we draw today, we believe it quite sound and necessary to protect a defendant's right to a fair trial. *See Jefferson–El v. State,* 330 Md. 99, 105, 622 A.2d 737, 740 (1993) ("A defendant in a criminal case has a right to a fair trial."); *Rainville v. State,* 328 Md. 398, 411, 614 A.2d 949, 955 (1992) (explaining that inadmissible evidence may have such a devastating and pervasive effect that, despite a curative instruction, it is impossible to salvage a fair trial for the defendant). Among the policies underlying the "primary purpose" and "mere subterfuge" cases is the concern that the government should not be permitted, "in the name of impeachment, to present testimony to the jury by indirection which would not otherwise be admissible." *Morlang,* 531 F.2d at 189. In *Spence,* we made clear that "blatant attempt[s] to circumvent the hearsay rule and parade inadmissible hearsay before the jury" should not be sanctioned. 321 Md. at 530, 583 A.2d at 717. *See also State v. Gage,* 302 N.W.2d 793, 799 (S.D.1981) (" '[B]ackdooring' of hearsay is not indicative of fair trial tactics...."); *Hogan,* 763 F.2d at 702 ("[S]uch a scheme merely serves as a subterfuge to avoid the hearsay rule.");

*Gomez–Gallardo,* 915 F.2d at 556 ("The adversarial system breaks down when the defendant is prevented from defining and presenting his own case and the prosecution proves guilt by creating and then destroying its own creation."). If, however, we permitted the State to question a witness regarding an independent area of inquiry for the sole purpose of admitting a highly prejudicial, prior inconsistent statement, when the State knows that such inquiry will contribute nothing substantive to its case, the hearsay rule and the defendant's right to a fair trial would certainly be circumvented. *Cf. Rainville,* 328 Md. at 411, 614 A.2d at 955. Thus, we see no reason to distinguish between the State requesting that a court's witness be called as a way to get inadmissible hearsay before the trier of fact (*i.e., Spence*), and the State questioning its own witness, in an independent area of inquiry, in order to get inadmissible hearsay before the trier of fact (*i.e.,* the instant case). In both situations, the rationale of *Spence* dictates that a subterfuge to introduce the statements should not be permitted.

### III.

Today's holding is a limited one. It simply recognizes that, in a criminal case, a defendant is denied a fair trial if the State, with full knowledge that its questions will contribute nothing to its case, questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement. Of course, if the area of inquiry is not clearly independent, then the State may impeach those portions of a witness's testimony that do not comport with the prosecution's theory of the case. Thus, in instances where a witness's testimony is not reasonably divisible into clearly separate areas of inquiry, the State may properly impeach any portion of the witness's testimony that disfavors the government's case. *Cf. United States v. Eisen,* 974 F.2d 246, 263 (2d Cir.1992) ("Here, the testimony of the hostile witnesses provided affirmative proof that was necessary to construct the Government's case, and thus the Government was entitled to question these witnesses

and to invite the jury to disbelieve that portion of their accounts that contradicted the prosecution's theory of the case."), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 1619, 1841, 123 L.Ed.2d 178, 467 (1993); *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.) ("Monahan's corroborating testimony was essential in many areas of the government's case. Once there, the government had the right to question him, and to attempt to impeach him, about those aspects of his testimony which conflicted with Gorman's account of the same events."), *cert. denied,* 449 U.S. 835, 101 S.Ct. 107, 108, 66 L.Ed.2d 41 (1980).

■ We are in general agreement with the United States Court of Appeals for the Seventh Circuit's comment that, "[w]hen a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of foregoing impeachment and the Charybdis of not calling the witness at all." *United States v. Kane,* 944 F.2d 1406, 1412 (7th Cir.1991). When dealing with an independent area of inquiry, however, the State is not faced with these two extremes. The government can call the witness and inquire about any pertinent substantive testimony, and simply forego asking questions for the sole purpose of impeaching the witness in the clearly separate area. When it is completely unnecessary for the State to elicit neutral or unfavorable testimony, we ought not permit it to do so for the sole purpose of opening the door to the admission of otherwise inadmissible evidence under the guise of impeachment.

Impeachment may be thought of as a shield; it protects a party from unfavorable testimony by neutralizing that testimony. *See* 1 *McCormick on Evidence* § 34, at 114 (explaining that impeachment by prior inconsistent statement is based on the notion that "talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements"); 6 Lynn McLain, *Maryland Evidence* § 607.1(b), at 37 (1987) ("Evidence which is admitted to impeach a witness comes in only to detract from the

witness'[s] credibility and not as substantive proof of the facts being litigated."). Impeachment should not be used as a sword to place otherwise inadmissible evidence before the jury when there is no reason whatsoever for eliciting the unfavorable testimony upon which the need for impeachment is predicated. *Cf. State v. Kidd*, 281 Md. 32, 47, 375 A.2d 1105, 1114 (stating, in the somewhat analogous situation concerning the admissibility of evidence obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that "[t]he prosecution is not permitted ... to impeach an issue which it first solicited on cross-examination"), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

■ We wish to emphasize that our holding is not applicable where there is no clearly independent area of inquiry or where failure to inquire into a possibly independent area of inquiry could create a gap in the witness's testimony such that a negative inference may arise against the prosecution. Today's holding does not prohibit the State from attempting to fill such a gap by questioning and then impeaching the witness. We believe, however, that no such gap would result in the instant case if the contents of the telephone conversation were not placed before the jury. We do not believe the jury would draw an adverse inference against the State simply because the prosecution failed to ask Adrian Bradley about the contents of the telephone conversation.

■ Further, the State is still entitled to impeach a witness with a prior inconsistent statement if the witness's testimony comes as a surprise. For instance, if the State called Adrian Bradley expecting him to provide testimony favorable to the State, but Bradley unexpectedly did otherwise, impeachment would be permitted. *See Poole v. State*, 290 Md. 114, 118, 428 A.2d 434, 437 (1981) (explaining that, even prior to the elimination of the voucher rule, impeachment of one's witness by a prior inconsistent statement would be permissible where "the calling party [was] surprised" by the witness's testimony). In this case, however, the State expressly informed the trial

judge that it knew Adrian Bradley would deny any incriminating statements were made in the telephone conversation.

■ Likewise, the State is permitted to impeach its witness with a prior inconsistent statement if the State did not create the need to impeach. For instance, if Adrian Bradley was asked, "what is your phone number?" and he responded by providing his number, but then volunteered that "my cousin called me on April 1st and he told me that he purchased a car," the State should be permitted to counter this unresponsive answer with the prior statement that the defendant bragged about stealing a car. In sum, where the State is not responsible for a "blurt" that harms its case, a prior inconsistent statement remains permissible impeachment evidence.

Finally, our holding does not affect *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). In *Nance*, we held as follows:

"[T]he factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced." (Footnote omitted).

331 Md. at 569, 629 A.2d at 643. Had Adrian Bradley's prior statement been reduced to writing and signed, thus making it admissible as substantive evidence rather than solely impeachment evidence, it would have been admissible. In the instant case, however, the prior statement by Adrian Bradley was not reduced to a writing and signed or adopted by him and, thus, it was not admissible as substantive evidence. Detective Sizemore simply made notes summarizing his conversation with Adrian Bradley. Thus, the only possible purpose in admitting the prior inconsistent statement was to impeach and thereby neutralize Adrian Bradley's testimony in an independent area which the State chose to open up. We decline to permit such a practice.

**608**

## IV.

■ The State argues that, even "[i]f this Court does find error, the error in the admission of the prior inconsistent statement was harmless beyond a reasonable doubt." The State maintains that the evidence of the defendant's guilt was "overwhelming." Based on the record before us, however, we are unable to say that the erroneously admitted statement "in no way influenced the [jury's] verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

First, we note the United States Supreme Court's comments in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante*, the Court recognized that "[a] confession is like no other evidence." 499 U.S. at 296, 111 S.Ct. at 1257, 113 L.Ed.2d at 322. The Court further acknowledged that a reviewing court should "exercise extreme caution before determining that the admission of [a] confession at trial was harmless." 499 U.S. at 296, 111 S.Ct. at 1258, 113 L.Ed.2d at 323. Moreover, in his concurring opinion, Justice Kennedy stated, "[i]f the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case." 499 U.S. at 313, 111 S.Ct. at 1266, 113 L.Ed.2d at 333 (Kennedy, J., concurring). *See also Commonwealth v. Benoit*, 32 Mass.App.Ct. 111, 586 N.E.2d 19, 22–23 (1992) (" '[A] defendant's statement is usually "the key item in the proof of guilt, and certainly one of overpowering weight with the jury." ' " (citations omitted)).

The State points to the victim's ability to identify the robber as one of the primary reasons for arguing that the admission of the prior inconsistent statement was harmless error. We are unable, however, to review Ms. Sisk's photo identifications of the defendant because, according to a notation in the Joint Record Extract, the State has been unable to locate the pertinent exhibits:

"The record forwarded to the Court for purposes of this appeal is incomplete. All State's exhibits in this case were returned to the Prince George's County State's Attorney's

Office following the trial . . . , and as of the date of the filing of Petitioner's Brief, that Office has been unable to locate them."

The defendant's explanation is confirmed by a December 5, 1991 docket entry that states: "ALL EXHIBITS RE-TURNED FOR USE IN FURTHER TRIAL PROCEED-INGS."

 Maryland Rule 4–322, entitled "Exhibits," declares that all exhibits "shall form part of the record and, unless the court orders otherwise, shall remain in the custody of the clerk." This rule attempts to assure that exhibits are preserved for future reference. In this case, however, the exhibits were not preserved which makes a harmless error analysis very difficult. Thus, when exercising its discretion in determining whether exhibits should or should not remain in the custody of the clerk, a trial judge should consider how inconvenient it is for the clerk to preserve the exhibits and also the importance of preserving exhibits for subsequent proceedings. Paper exhibits such as the photographs and the telephone bill in the instant case could be easily preserved by the clerk within the case file. Further, if the court determines that the exhibits should be returned to the parties, it should attempt to assure that the parties preserve them so they will be available for appellate review or in the event of a new trial. With this in mind, we shall now conduct our harmless error analysis.

At the time Ms. Sisk's automobile was returned to her by the District of Columbia police, she found a photograph containing several individuals (including the defendant) on the passenger side floor of the car. Subsequently, she met with Detective Sizemore of the Prince George's County police department and told him that "one of the guys [in the photograph] looks like" the person who robbed her. As it turned out, however, the individual she believed looked like the robber was not the defendant. Ms. Sisk later did select the defendant's photograph from among a "photo spread" of six different pictures when asked to identify the robber.

It is conceivable that Ms. Sisk's initial mistake in identifying her assailant was significant—the individual she first identified may have looked nothing like the defendant. In fact, Bradley's counsel argued to the jury that, "[Ms. Sisk] picked out someone else saying he looks kind of like the guy, and this guy doesn't look at all [like the defendant], if you ask me. I am not the judge but ask yourselves does he look like Mr. Bradley? No, I don't think so. Wrong complexion. Wrong facial hair. Wrong everything. Wrong guy." Although a mistaken identification might ordinarily carry considerable weight in the jury's assessment of Ms. Sisk's ability to identify her assailant, the jury may have excused her mistake in light of the statement that the defendant bragged about stealing the car. *See Fulminante*, 499 U.S. at 313, 111 S.Ct. at 1266, 113 L.Ed.2d at 333 (Kennedy, J., concurring) ("If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case."). Since the State's exhibits are unavailable, we are unable to compare whether, as depicted in the photographs, the defendant bore striking similarities or no similarities whatsoever with the person Ms. Sisk identified as looking like the robber. If the individuals look nothing alike, Ms. Sisk's ability to identify the robber may be suspect. We are also unable to determine the extent to which a positive identification was possible from the group photograph. Although Ms. Sisk claimed that she "couldn't see [the defendant's] face" in the group photo, Detective Sizemore was able to recognize the defendant in the photograph. Conceivably, the defendant's ability to present his defense of mistaken identity, in a case that turned upon the victim's ability to identify her assailant, was seriously undermined by the admission of the statement in which the defendant bragged about stealing the car. Mindful of these comments, we are unable to conclude from the record that, beyond a reasonable doubt, the prior inconsistent statement (*i.e.*, the defendant "bragg[ed] about the fact that he had stolen a car") in no way influenced the jury's verdict. *See, e.g., Beales v. State*, 329 Md. 263, 274, 619 A.2d 105, 111

(1993) ("When an appellant in a criminal case establishes error, unless the reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed harmless.").

■ Finally, the State contends that the trial judge's limiting instructions were sufficient to prevent the jury from being improperly influenced by the prior inconsistent statement. While Detective Sizemore was still on the witness stand, the trial judge instructed the jury as follows:

"Let me explain something to the jury before you go any further. I want the jury to understand the last question that was asked of the detective is not evidence that you may use in this case. The last question that was asked of the detective was for the sole purpose to impeach the credibility of Adrian Bradley.

The State asked Adrian Bradley a direct question and got a flat no as an answer. The State has now asked Detective Sizemore the same question as having been asked by him to Adrian Bradley and the answer was different, therefore, the only use that you can make of the answer that Detective Sizemore said that Adrian Bradley gave him is to judge Adrian Bradley's credibility. That is all. You cannot use it in anyway whatsoever in judging whether or not the Defendant is guilty or not guilty of having committed the alleged crime."

At the close of all the evidence, the judge further instructed the jury that "[t]he only purpose for [the prior inconsistent statement] was to assist you in believing or disbelieving whatever else the witness said on the stand."

Although "the law frequently permits the jury to hear evidence admitted for a limited purpose, and presumes that the jury will comply with an appropriate instruction," *McKnight v. State*, 280 Md. 604, 615, 375 A.2d 551, 557 (1977), we are unwilling to apply this presumption in the instant case. Under the rationale of *Spence*, the prior inconsistent statement was not properly admitted even for the limited purpose

of impeaching Adrian Bradley. *See State v. Watson*, 321 Md. 47, 58, 580 A.2d 1067, 1072 (1990) (concluding that limiting instruction did not cure error when evidence should not have been admitted even for limited purpose). *Cf. Rainville*, 328 Md. at 411, 614 A.2d at 955 (stating, in a case involving improperly admitted other crimes evidence, that "[i]t is highly probable that the inadmissible evidence in this case had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could salvage a fair trial for the defendant."). Moreover, apparently the only reason the State sought to introduce the prior inconsistent statement was its belief that the jury would be swayed by the statement when determining guilt or innocence.[5] *See United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984) ("[I]t would be an abuse of the [impeachment] rule, in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just·so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, *if it didn't miss it, would ignore it.*" (emphasis added)). *See also Nance*, 331 Md. at 566, 629 A.2d at 642 (recognizing the jury's "difficult task of separating substantive proof from impeachment evidence bearing solely on a wit-

---

**5.** In closing arguments, the prosecutor intimated that the jury might consider the prior inconsistent statement substantively:

"Let me talk a little bit about Adrian Bradley. I went on to ask Adrian about what his conversation with Detective Sizemore was about and whether or not he told Detective Sizemore what the Defendant told him. Well, folks, as I said before,·Mr. Bradley knew that we had the phone records. I think he was willing to admit the things that we could prove, but I think when it came time to asking him about what the Defendant said to him, that is when he knew that we couldn't prove that and it was time for him to clam up as a cousin, as a friend of the Defendant he wasn't going to supply that information.

So, ladies and gentlemen, if you are getting the impression on one hand [that I am] asking you to believe that he gave us the right phone number, [and] on the other hand not to believe his denial of statements to the [detective,] that is exactly right and I hope that I have explained to you the reasons for that and the reasons are quite simple that you know he doesn't want his cousin getting in trouble. I think that is reasonable."

ness's credibility"); *State v. Hunt*, 324 N.C. 343, 378 S.E.2d 754, 758 (1989) (noting the "jury's likely confusion regarding the limited purpose of impeachment evidence"); *Morlang*, 531 F.2d at 190 ("[D]espite proper instructions to the jury, it is often difficult for them to distinguish between impeachment and substantive evidence."); *Benoit*, 32 Mass.App.Ct. 111, 586 N.E.2d at 23 ("[L]imiting instructions are inadequate where the danger of prejudice is great and ' "it is simply unrealistic" ' to believe that the jury would adhere to the 'refined distinctions demanded by the limiting instruction[s].' " (quoting *Commonwealth v. Bond*, 17 Mass.App.Ct. 396, 458 N.E.2d 1198, 1200, *cert. denied*, 391 Mass. 1103, 461 N.E.2d 1219 (1984), in turn quoting *United States v. Brown*, 490 F.2d 758, 765 (D.C.Cir.1973))). Because the State implicitly assumed at trial that the jury would be influenced by the prior inconsistent statement, we are unwilling to say that the limiting instruction remedied the potential prejudice to the defendant. *See Benoit*, 32 Mass.App.Ct. 111, 586 N.E.2d at 23 ("The judge's [limiting] instructions to the jury, while entirely appropriate in the ordinary case, did not 'come near purging the error' in this case." (quoting *Commonwealth v. Key*, 21 Mass.App.Ct. 293, 486 N.E.2d 1139, 1143 (1985))); *State v. Rufener*, 401 N.W.2d 740, 745 (S.D.1987) ("We do not believe these curative instructions atone for the overreaching of the prosecutor.").

## V.

With full knowledge that Adrian Bradley would refuse to inculpate the defendant, the State, over objection, questioned him concerning a clearly independent area of inquiry solely to "parade inadmissible hearsay before the jury." *Spence*, 321 Md. at 530, 583 A.2d at 717. We refuse to sanction this attempt to circumvent the hearsay rule, and because we find this error was not harmless, the defendant is entitled to a new trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENTS OF*

*CONVICTIONS AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL. ALL COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.*