941 A.2d 498

**Steven JONES**

v.

**STATE of Maryland.**

**No. 1603, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Feb. 7, 2008.

Amanda M. Downs (Nancy S. Forster, Public Defender, on brief), for appellant.

Robert Taylor (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel DAVIS, JAMES R. EYLER and WOODWARD, JJ.

EYLER, JAMES R., J.

Steven Jones, appellant, was convicted by a jury, sitting in the Circuit Court for Washington County, of attempted first degree murder, first degree assault, use of a handgun in the commission of a crime of violence, possession of a handgun under the age of 21, and wearing, carrying or transporting a handgun on or about one's person. After merging offenses, the court imposed a sentence of 40 years for attempted first degree murder, and a consecutive ten year sentence for the use of a handgun in the commission of a crime of violence.

On appeal, appellant contends that the trial court erred in allowing the State to introduce extrinsic evidence of a witness' prior inconsistent statement because the State had failed to lay the proper foundation. Appellant also contends that the trial court erred in allowing the State to call the witness for the sole purpose of impeaching him with a prior inconsistent statement. Perceiving no reversible error, we shall affirm.

## Factual Background

On January 8, 2006, at approximately 5:00 p.m., David W. Webb, Jr. was standing outside 13 North Locust Street in Hagerstown, with his fiancée, Brook Rutherford. He testified that, while he was standing outside, a boy rode by on what Mr. Webb believed to be his stolen Mongoose bicycle. Mr. Webb then proceeded to approach the boy and asked him, not in "a polite way," for the bike back. While Mr. Webb and the boy

were conversing about the bike, Mr. Webb, out of the corner of his eye, saw someone approach him from across the street. The person shot Mr. Webb in the face.

After being shot, Mr. Webb ran down the street in the direction of his home. The assailant fired another shot at Mr. Webb as he ran, which missed. Mr. Webb looked back to see where the shooter was and noticed he was crossing the street and moving toward Ms. Rutherford. Mr. Webb then ran across the street, pushed Ms. Rutherford out of the way, told her to run inside the house, and call the police. As Ms. Rutherford was going inside, Mr. Webb saw the shooter approaching him again. Mr. Webb curled up into a ball, and the shooter shot him again in the head. After he was shot, Mr. Webb opened his eyes and saw the shooter run "up the street and around the corner on Washington Street." During his direct examination, Mr. Webb identified appellant as the shooter.

Officer Thomas Bartles, a Hagerstown City police officer, testified that he received a call at 5:19 p.m. advising that a shooting had occurred in the unit block of North Locust Street. Officer Bartles immediately responded and observed several individuals standing around a man, later identified as Mr. Webb, lying on the ground with blood coming from his head. Officer Bartles asked Mr. Webb if he could describe the assailant. Mr. Webb responded that "the shooter was a dark skinned black male."

Officer Bartles further testified that, on the day of the incident, uniformed patrol officers stopped two subjects in the first block of South Locust Street. Both subjects were taken to the precinct for one-on-one identification. Appellant, one of the subjects, was arrested and charged with the shooting.

The trial occurred on August 31, 2006. In addition to Mr. Webb and Officer Bartles, the State called eight witnesses. The relevant testimony is summarized below.

Alice Smith, a neighbor of Mr. Webb, testified that she was outside at the time of the shooting. She observed Mr. Webb cross the street to speak to a light skinned black male on a

bike and then saw another man approach Mr. Webb and shoot him in the head. Ms. Smith identified the weapon used as a silver handgun, about six inches long. She also testified that she heard the gun fire three times. When Ms. Smith was asked if she saw the man that shot Mr. Webb in the courtroom, she responded, "I'm going to say that he . . . he looks very similar to the man. I'm not going to say it's exactly him. Cause it has been a while since I've seen him. But, yes, to me he does look a lot like him."

Thirteen-year-old Amanda Sweeney–Teal testified that she met a man who introduced himself as "Twenties," at the corner store on the day of the shooting.[1] The State asked Ms. Sweeney–Teal whether "that person that you met that was known as Twenty, that introduced himself as Twenty, do you see him in the courtroom today?" She identified appellant as that man. She further testified that "Twenties" shot Mr. Webb and she saw three flashes from the gun.

Ms. Sweeney–Teal's friend, Patricia Weedon, testified that she was walking with Ms. Sweeney–Teal when a man, whom she later identified as appellant, approached them and introduced himself as "Twenty." She then observed Mr. Webb involved in an altercation with the boy on the bike and observed Twenty approach Mr. Webb and shoot him. She could not identify a weapon, however.

Brooke Rutherford, Mr. Webb's fiancée, testified that she was standing outside at the time of the altercation. Ms. Rutherford identified appellant as the man who shot Mr. Webb. Ms. Rutherford further testified that she did not see the gun.

The State also called Joshua Brown. Both of appellant's contentions revolve around the testimony of Mr. Brown. Mr. Brown testified that on January 8, 2006, at approximately 5:00 p.m., he was on Locust Street with a Mongoose bicycle with

---

1. Ms. Sweeney–Teal testified that she met "Twenties and some other boy" on her way to buy sunflower seeds with her friend. She referred to him as "Twenties" throughout her testimony. The State referred to this same individual as "Twenty" in its questions.

"somebody named Kevin." The State then asked Mr. Brown "[w]hat happened?" In response, Mr. Brown testified that "the boy named Kev shot [Mr. Webb]." He stated that he had a silver, short gun and that, after he saw Kevin pull the gun out and heard it go off, he ran. He stated that no other friends were on Locust Street at that time. The State then continued questioning as follows:

[State]: Are you familiar with an individual named Twenty?

[Witness]: No.

[State]: You don't know anyone named Twenty? Do any of your friends use that nickname?

[Witness]: Oh, I don't know.

[State]: Okay. Do you recall being at the Hagerstown Police Department? Do you remember being interviewed by . . . .

[Defense Counsel]: Objection.

The Court: Overruled.

[Defense Counsel]: For the record, it's her own witness.

The Court: That doesn't make any difference.

[Defense Counsel]: And he hasn't been declared . . . .

The Court: Overruled.

[State]: Do you recall being interviewed by Sergeant Kifer and Sergeant Robinson from the Hagerstown Police Department? Do you recall that?

[Defense Counsel]: Objection.

The Court: Overruled.

Court Reporter: We are not recording his answer.

[State]: Can you repeat your answer? Do you remember talking to Sergeants . . . .

[Witness]: Yes, ma'am.

[State]: Yes. Okay. Do you recall them interviewing you regarding this incident?

[Defense Counsel]: Objection.

The Court: Overruled.

[Witness]: Yes, ma'am.

[State]: Okay. Do you recall what you told them? Do you remember what you told Sergeant Kifer?

[Witness]: No.

[State]: You don't remember what you said to him?

[Defense Counsel]: Objection. Asked and answered.

The Court: Overruled.

[State]: Do you recall *telling Sergeant Kifer*. . . .

[Witness]: No ma'am.

[State]: Can I finish my question? Do you recall telling Sergeant Kifer that Twenty was on Locust with you?

[Witness]: Locust?

[State]: Yes.

[Witness]: Ah, I don't know anybody named Twenty.

[State]: So you . . . is it your testimony here today that when you were talking . . . when you were interviewed by members of the Hagerstown Police Department you never said the name Twenty?

[Witness]: Yeah, I said the name Twenty.

[State]: You did? Who were you talking about?

[Witness]: The dude that was with us.

[State]: Now, there was somebody with you?

[Witness]: Yeah.

[State]: Who . . . where was he?

[Witness]: Huh?

[State]: Who was . . .

[Witness]: He was around the corner.

[State]: He stayed around the corner?

[Witness]: Yeah.

[State]: When you say around the corner. . . .

[Witness]: Around the corner on Franklin.

[State]: So, Twenty never came on to Locust?

[Witness]: No.

[State]: But Kevin Harris. . . . Let me ask you this, do you recall two girls being across the street?

[Witness]: No, I don't.

[State]: Okay. Earlier in your testimony you talked about two females that were walking and talking.

[Witness]: But they wasn't with me though.

[State]: I'm sorry?

[Witness]: They was not with me.

[State]: Those two girls weren't with you?

[Witness]: No, they was not with me.

[State]: Okay. Who was with them?

[Witness]: Huh?

[State]: Was anyone with those two girls?

[Witness]: The boy named Kevin was with 'em.

[State]: Okay. How do you know Twenty?

[Witness]: Huh?

[State]: How do you know Twenty?

[Witness]: How do I know him? Through the boy named Kev.

[State]: Okay. Do you consider Twenty your friend?

[Witness]: Oh, no.

[State]: He was not your friend?

[Witness]: It was just somebody I knew.

[State]: Thank you. Nothing further.

Following Mr. Brown's testimony, the State called Sergeant Paul Kifer, supervisor of the Criminal Investigation Unit, to the stand. The pertinent part of his testimony follows:

[State]: Okay. Sergeant, I'm going to direct your attention to, ah, an incident that occurred on North Locust Street on January eight, 2006, a shooting. Are you familiar with that investigation?

[Witness]: Yes, I am.

[State]: Okay. Ah, are you familiar with an individual named J.D. Brown or Joshua Brown?

[Witness]: Yes, I am.

[State]: How are you familiar with him?

[Witness]: We had gotten information as part of the investigation that there was someone that could possibly be....

[Defense Counsel]: Objection, your Honor, to background.

The Court: Overruled.

[Witness]: Ah, someone possibly named JB or used the name JB. During our investigation with the Narcotics Task Force, ah, Mr. Brown was picked up in a separate incident, ah, as part of that investigation, brought into the police department. I was there at that time and Sergeant Robinson and I then interviewed him.

[State]: Okay. When did the interview occur?

[Witness]: That was on the tenth, I believe. Let me just refer to my notes here real quick. The tenth is when the ... the detail took place. He w as actually brought in and I actually interviewed him on the eleventh, early in the morning on the eleventh.

[State]: Of January?

[Witness]: Yes.

[State]: Did you speak to him about the shooting incident on January eighth, 2006?

[Witness]: Yes, I did.

[State]: Did he give a name or a nickname of a shooter?

[Defense Counsel]: Objection, your Honor.

[State]: Impeachment, your Honor.

[Defense Counsel]: Objection, your Honor.

The Court: Overruled.

[Witness]: Yes, he did.

[State]: What name did he give?

[Defense Counsel]: Objection.

The Court: Overruled.

[Witness]: He gave the name of Twenty.

[State]: Okay. Thank you. Nothing further.

Appellant called no witnesses on his behalf. The jury convicted appellant on all charges.

### Contentions

First, appellant contends that the trial court erred in allowing the State to introduce extrinsic evidence of Mr. Brown's prior inconsistent statement because the State failed to lay a proper foundation. Second, appellant contends that the trial court erred in allowing the State to call Mr. Brown as a witness for the sole purpose of impeaching him with a prior inconsistent statement that would otherwise constitute inadmissible hearsay.

### Discussion

*A.  Foundation Requirements to Admit Prior Inconsistent Statements*

At common law, Maryland followed the "voucher rule," which did not allow a party to impeach its own witness because the party "vouched" for the witness's credibility when putting him or her on the stand.  However, a narrow exception existed.

> While a party ordinarily may not impeach his own witness by proof of prior statements which are inconsistent with, or contradictory to, his testimony at trial, where such party satisfies the court that he has been taken by surprise and that the testimony is contrary to what he had a right to expect, it is within the sound discretion of the trial court to determine whether or not proof of prior inconsistent statements should be permitted.

*Hernandez v. State,* 7 Md.App. 355, 365, 255 A.2d 449 (1969) (citations omitted).

Even if the party was surprised, however, before proving the prior inconsistent statement through extrinsic evidence, a proper foundation had to be laid.  *Smith v. Briscoe,* 65 Md. 561, 569–70, 5 A. 334 (1886).  The foundational requirement was met by interrogating the witness as to when, the place at which, and the person to whom the contradictory statements were made.  *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 439, 71 A.2d 442 (1950).  If the witness denied making the prior statement or stated that he did not remember whether

he made it, the foundational elements for introducing the statement were satisfied. *Campbell v. Patton*, 227 Md. 125, 141, 175 A.2d 761 (1961); *Moxley v. State*, 205 Md. 507, 516–17, 109 A.2d 370 (1954).

In 1994, the Maryland Rules of Evidence were adopted, and the voucher rule was eliminated. *See* Maryland Rule 5–607("The credibility of a witness may be attacked by any party, including the party calling the witness."); *see also* Committee Note to Maryland Rule 5–607 ("This Rule abrogates the common-law voucher rule. . . ."). Furthermore, the use of prior statements of witnesses, for the purpose of impeachment, including the required foundational elements, are now codified in Maryland Rule 5–613(a). The Rule provides:

(a) Examining Witness Concerning Prior Statement. A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

Maryland Rule 5–613.

There is little case law commenting on or explaining the foundational elements, following the adoption of the Maryland rules. *See McCracken v. State*, 150 Md.App. 330, 342–45, 820 A.2d 593 (2003). Because the common law foundational elements and the Rule foundational elements are essentially the

same, case law prior to the adoption of the Maryland Rules of Evidence is relevant.

The foundational requirements exist in order to be "fair and just to the witness ... [so] that he may be enabled to refresh his recollection in regard to such statements...." *Devan v. State,* 17 Md.App. 182, 192, 300 A.2d 705 (1973) (quoting *Brown v. State,* 72 Md. 468, 475, 20 A. 186 (1890)). The purpose of the foundational requirements is "to accord the witness the opportunity to reflect upon the prior statement so that he may admit it or deny it, or make such explanation of it as he considers necessary or desirable." *Devan,* 17 Md.App. at 193, 300 A.2d 705. The Court has also stated that

> there is no unvarying formula or ritual required for the establishment of a foundation to impeach. It is required that a witness be informed, sometime during the course of his testimony, that his interrogator is aware of and relying upon a statement the witness is claimed to have made at a particular time and place, to a particular person.

*Id.*

After the adoption of the Maryland Rules of Evidence, this Court, in *McCracken v. State,* 150 Md.App. at 342–44, 820 A.2d 593, had an opportunity to analyze the foundational requirements that must be met before a prior inconsistent statement can be proved by extrinsic evidence. In *McCracken,* the defendant was arrested for carrying a concealed antique civil war gun into a bank. *Id.* at 334–35, 820 A.2d 593. After the defendant was arrested but before his *Miranda* rights were administered, the defendant told the police officers that if the trigger of the gun he was carrying was pulled, a projectile would be discharged and someone could be killed. *Id.* The trial court suppressed these statements. *Id.* at 336, 820 A.2d 593. The defendant testified in his own defense at trial, and during the State's cross-examination, he stated that the gun was not loaded or capable of being fired. *Id.* at 339, 820 A.2d 593. Without further questioning on cross-examination, the State then called one of the arresting officers in rebuttal to testify that the defendant had told him the gun was

loaded at the time of arrest. *Id.* at 339–40, 820 A.2d 593. The State also relied on this testimony in its closing argument to reiterate to the jury that the defendant had told the officers the gun was loaded at the time of arrest. *Id.* at 340, 820 A.2d 593.

This Court found reversible error, stating that the State failed to lay a proper foundation before introducing extrinsic evidence. *Id.* at 341, 820 A.2d 593. We explained that

> the State failed to give appellant an opportunity, during cross-examination, to explain his statements to the officers. . . . The prosecutor never asked appellant about the circumstances surrounding the statements he made to the officers at the time of his arrest, nor did he allow appellant to admit, deny, or explain the substance of the statements. Instead, the prosecutor waited for appellant to rest his case and then called [the arresting officer] to the stand as a rebuttal witness to impeach appellant's testimony through extrinsic evidence.

*Id.* at 344, 820 A.2d 593.

The present case is unlike *McCracken*. The State's questions to Mr. Brown regarding the prior inconsistent statement sufficiently satisfied the foundational requirements. The State asked Mr. Brown if he was familiar with an individual named "Twenty" or if any of his friends used the nickname "Twenty." He responded that he did not know any individual by that name. He was asked if he remembered being interviewed by Sergeant Kifer and Sergeant Robinson of the Hagerstown Police Department. Mr. Brown responded affirmatively. He further agreed that he had been interviewed regarding the shooting. Mr. Brown testified that he did not remember what he told Sergeant Kifer. The State further inquired whether Mr. Brown recalled telling Sergeant Kifer that Twenty was with him on Locust Street. Mr. Brown then testified that he did mention the name Twenty but he was not on Locust Street.

It is clear from the questions asked and Mr. Brown's responses that Mr. Brown was given an opportunity to admit,

deny or explain the statement given to Sergeant Kifer at the Hagerstown Police Station. Mr. Brown was advised of the circumstances surrounding the statement. He testified that he could not recall what he told the police and initially denied knowing an individual named Twenty. Mr. Brown was given an adequate opportunity to reflect upon the statement and admit, deny or explain it while still on the witness stand. Thus, the State met the foundational requirements, and the court did not err in allowing the rebuttal testimony.

## B.  Calling a Witness as Mere Subterfuge

■ Appellant argues that the trial court committed error by allowing the State to call Mr. Brown as a witness, asserting that there was no legitimate purpose in calling the witness other than to elicit his prior inconsistent statement that would otherwise be inadmissible. The State first counters by claiming that appellant failed to preserve the issue because appellant did not object when Mr. Brown was called to the stand. On the merits, the State argues that there is no evidence that the State had "full knowledge" Mr. Brown was going to recant, and in any event, a valid purpose existed to call Mr. Brown to the stand.

We conclude that appellant preserved this issue for appellate review. Appellant's counsel objected as soon as the State began the line of questioning involving the prior inconsistent statement. Furthermore, appellant attempted to voice that Mr. Brown was the State's witness and before he was allowed to explain his reasoning the Court stopped counsel. Counsel's objection was sufficiently broad to preserve appellant's claim.

■ Maryland Rule 5–607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Maryland Rule 5–607.[2] A limited exception has been enunciated in case law, however, in that "[t]he State cannot, over objection, have a witness called who it

---

2. The use of prior statements by witnesses as substantive evidence is not before us.

knows will contribute nothing to its case, as a subterfuge to admit, as impeaching evidence, otherwise inadmissible hearsay." *Spence v. State*, 321 Md. 526, 530, 583 A.2d 715 (1991). Although *Spence* was decided prior to the enactment of the Maryland Rules of Evidence, a number of cases have built on the foundation laid by *Spence*.

In *Spence*, the prosecutor told the judge during a bench conference that a witness "would testify that Spence was not involved, but that his purpose for calling [the witness] was to get before the jury prior out-of-court statements [the witness] had made to police officers that, in fact, Spence was one of the perpetrators of the burglary and robbery...." *Id.* at 528, 583 A.2d 715. The Court of Appeals held that "[t]his blatant attempt to circumvent the hearsay rule and parade inadmissible evidence before the jury is not permissible." *Id.* at 530, 583 A.2d 715. Furthermore, the Court stated that "[t]he sole value to the State from Cole's testimony was that it opened the door for the 'impeaching' testimony for [the witness'] prior inconsistent statement." *Id.*

The Court of Appeals built on the principles laid down in *Spence* when it decided *Bradley v. State*, 333 Md. 593, 636 A.2d 999 (1994). The defendant in *Bradley* was charged with kidnaping, armed robbery, use of a handgun in the commission of a felony or crime of violence, and related offenses. *Id.* at 596, 636 A.2d 999. The defendant held the victim at gunpoint, ordered her into her car, and forced her to drive several blocks. *Id.* He then "ordered her out of the vehicle, grabbed her purse, and drove off in her car." *Id.*

To place the defendant in the car after it was taken, the State offered the victim's car phone bill, "which indicated that calls were placed from her car phone to a particular phone number within one-half hour of the theft." *Id.* at 597, 636 A.2d 999. The State called the defendant's cousin, and he testified that he had received one or two phone calls from the defendant at a time subsequent to the theft. *Id.* In response to the prosecutor's question, the cousin then denied telling an officer that appellant had told him he had stolen a car. *Id.*

The State put the police officer on the stand to recount the interview with the cousin. *Id.* The prosecutor indicated at trial that he knew before trial the cousin had recanted his earlier statements and there was a possibility he would do so on the stand. *Id.* at 597–98, 636 A.2d 999.

On appeal, the State contended that because the cousin's testimony

substantively aided the prosecution's case, the State maintain[ed] that the questions regarding the contents of his conversation with the defendant in no way violate *Spence* . . . [because the State contends] if you call a witness for a proper purpose, you may inquire into any additional relevant area for the sole purpose of opening the door for impeachment by a prior inconsistent statement.

*Id.* at 601, 636 A.2d 999.

The Court disagreed, however, holding that "a defendant is denied a fair trial if the State, with full knowledge that its questions will contribute nothing to its case, questions a witness concerning an independent area of inquiry in order to open the door for impeachment and introduce a prior inconsistent statement." *Id.* at 604, 636 A.2d 999. The Court qualified its holding by stating that "our holding is not applicable where there is no clearly independent area of inquiry or where failure to inquire into a possibly independent area of inquiry could create a gap in the witness's testimony such that a negative inference may arise against the prosecution." *Id.* at 606, 636 A.2d 999.

In addition, the State is able to impeach a witness with a prior inconsistent statement if the witness's testimony is a surprise. *Id.* The Court gave the example in *Bradley* that if the cousin had been called to give favorable testimony to the State but unexpectedly did otherwise, impeachment would be permissible. *Id.* (citations omitted).

Furthermore, the Court stated that if the State does not create the need to impeach its own witness, then it is allowed to impeach the witness with a prior inconsistent statement. *Id.* at 607, 636 A.2d 999. As an example, the Court stated that

if [the cousin] was asked "what is your phone number?" and he responded by providing his number, but then volunteered that "my cousin called me on April 1st and he told me that he purchased a car," the State should be permitted to counter this unresponsive answer with the prior statement that the defendant bragged about stealing a car.

*Id.*

The Court of Appeals had another opportunity to address the State's impeachment of its own witness in *Walker v. State*, 373 Md. 360, 818 A.2d 1078 (2003). In *Walker*, the defendant was charged with distribution of cocaine and conspiracy to distribute cocaine on two separate dates in May, 2000. *Id.* at 367 n. 1, 818 A.2d 1078. The State moved to compel the testimony of Myrick, a dealer whose drugs were supplied by Walker. *Id.* at 367, 818 A.2d 1078. During Myrick's direct testimony, he stated that Walker was not involved with the drugs and Walker was only in the area because Myrick owed him money. *Id.* at 368, 818 A.2d 1078. The State declared that it was going to impeach Myrick with a prior inconsistent statement given to the police, implicating Walker. *Id.* The trial court found that the State was surprised by Myrick's testimony and allowed the State to attempt to impeach him with the prior inconsistent statement. *Id.* at 369, 818 A.2d 1078.

The Court of Appeals then adopted the analysis set forth by the Court of Special Appeals in *Walker v. State*, 144 Md.App. 505, 798 A.2d 1219 (2002), *rev'd in part*, 373 Md. 360, 818 A.2d 1078 (2003), and *Pickett v. State*, 120 Md.App. 597, 707 A.2d 941 (1998).[3] The Court of Special Appeals, in *Walker*, held that the only limitation on a party's ability to impeach its own witness is the subterfuge limitation. *Walker*, 144 Md.App. at 518, 798 A.2d 1219. This limitation is only applicable if the

---

**3.** The issue in *Walker* was whether the State had to show surprise as a prerequisite for using a prior inconsistent statement to impeach its own witness. The Court of Appeals "interpret[ed] *Bradley* to mean that a showing of surprise by the calling party is but one possible indication that the calling party did not have full knowledge that the witness would recant on the stand." *Walker*, 373 Md. at 387, 818 A.2d 1078.

State has full, advance knowledge that the witness will recant his or her prior statement. *Id.* at 523, 798 A.2d 1219. Partial knowledge that the witness will recant is not sufficient to trigger this limitation. *Id.*

Thus, when only partial knowledge was demonstrated, because this Court could not expect the trial judge to "crawl inside the prosecutor's head to divine his or her true motivation[,]" this Court applied the Maryland Rule 5–403 balancing test to determine whether a witness's testimony offered as impeachment was admissible. *Id.* at 524, 798 A.2d 1219 (quoting *Pickett,* 120 Md.App. at 604–05, 707 A.2d 941).

The Court defined probative value as the "likelihood of actually damaging the witness's credibility." *Id.* at 533, 798 A.2d 1219 (quoting *Pickett,* 120 Md.App. at 605, 707 A.2d 941). When analyzing the probative prong of the test, a court must determine if the witness has something useful to contribute to the prosecution's case other than the admission of his or her prior inconsistent statement. *Id.* This must be weighed against the prejudicial prong, which "requires the court to consider whether the evidence prejudices the defendant unfairly, or misleads or confuses the jury." *Id.* (citations omitted). Furthermore, the witness's testimony must be evaluated to determine if the testimony is "useful to establish any fact of consequence significant in the context of the litigation," and therefore, the witness may be impeached by the prior inconsistent statement. *Id.* at 528, 798 A.2d 1219 (quoting John W. Strong, McCormick on Evidence § 38, at 142 (5th ed.1999)).

Thus, the test laid out by this Court and adopted by the Court of Appeals in *Walker,* required the court to determine if the State had full knowledge that the witness was going to recant. If the State did not, the trial court was required to balance the probative value of the witness's testimony against its prejudicial nature to determine whether the State would be allowed to introduce a prior inconsistent statement to impeach the witness.

██ Appellant relies heavily on *Spence* and *Bradley* to support its claim that the State was not surprised by Mr.

Brown's recanting his testimony, and therefore, the only purpose for calling Mr. Brown was to introduce Mr. Brown's prior inconsistent statement. To support his contentions, appellant argues that if the State truly expected Mr. Brown to testify favorably for the prosecution, the prosecutor would have mentioned his anticipated testimony to the jury during opening statements, as the prosecutor had done with other witness's testimony. The only other evidence appellant offers to prove the State had "full knowledge" that Mr. Brown was going to recant his testimony was the prosecutor's use of Kevin Harris' last name even though Mr. Brown had only referred to him as "Kev" or "Kevin" throughout his testimony.

Contrary to appellant's argument, we conclude that the record does not demonstrate that the State had full knowledge that Mr. Brown would recant his testimony. The prosecutor could have made a tactical decision to not include Mr. Brown in her opening statement, as she did not name every witness that was called at trial and describe the expected testimony. Furthermore, Sergeant Kifer testified that Kevin Harris was the other individual arrested by the Police Task Force. The fact that the prosecutor was aware of his full name only means that the prosecutor exercised diligence and awareness in preparing for trial. Neither of these pieces of evidence or anything in the transcript leads us to the conclusion that the State had full knowledge that Mr. Brown was going to recant.

■ Furthermore, the State had a legitimate purpose in calling Mr. Brown to the stand. Mr. Brown was in the middle of the events that transpired on January 8, 2006. He was in possession of the bike that caused the dispute. He was arguing with Mr. Webb when Mr. Webb was shot that night. The fact that Mr. Brown decided to tell the jury "The boy named Kev shot [Mr. Webb,]" in response to the question "What happened" does not mean the State "created the need to impeach" Mr. Brown. Mr. Brown could have fashioned a number of responses to that question that may not have risen to the level of allowing the State to impeach him. But because he responded with a direct contradiction of an earlier state-

ment, he opened himself up to the possibility of the State impeaching him with the prior inconsistent statement. As said in *Bradley,* the State is not responsible when a witness "blurts" out a statement that harms its case and creates a need to impeach the witness. *Bradley,* 333 Md. at 607, 636 A.2d 999.

Assuming that the State had partial, but not full knowledge, appellant claims that the trial court failed to exercise the balancing test outlined above, and if the court had properly conducted the test, it would have concluded that the prejudicial nature outweighed the probative value of the testimony.

The fact that the record does not reflect whether a trial court conducted the balancing test does not mean the court did not do so. "There is a strong presumption that judges properly perform their duties." *Walker,* 144 Md.App. at 535, 798 A.2d 1219 (citing *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105 (1993)). "A trial court is 'not obliged to spell out in words every thought and step of logic' leading to its determination." *Id.* (quoting *Beales,* 329 Md. at 273, 619 A.2d 105). Furthermore, "there is no requirement that the trial court perform the Md. Rule 5–403 balancing test *on the record.*" *Id.*

Thus, we conclude that when the circuit court overruled appellant's objection to the State using Mr. Brown's prior inconsistent statement and the rebuttal testimony of Sergeant Kifer, it properly conducted the balancing test and decided that the probative value outweighed any prejudice to appellant. There is nothing in the record before us that causes us to conclude the court abused its discretion. Therefore, the trial court did not err in allowing the State to use Mr. Brown's prior inconsistent statement.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**